JAMES M. GREEN, in behalf of himself, and all other persons similarly situated who may come and join in a class action, appellant, v. CITY OF MT. PLEASANT, appellee.

No. 51515.

(Reported in 131 N.W.2d 5)

1188

1190

OCTOBER 20, 1964.

John F. Elgar, of Mt. Pleasant, for appellant.

Roger S. Galer, of Mt. Pleasant, for appellee.

MOORE, J.—Plaintiff in this "test case" for declaratory judgment and injunctive relief attacks the constitutionality and validity of chapter 247, Laws of the Sixtieth General Assembly. The title of the Act is:

"AN ACT authorizing cities and towns to acquire, purchase, construct, reconstruct, improve, extend and lease industrial buildings; authorize the issuance of revenue bonds of cities and towns for the purpose of securing and developing industry and provide for the payment of certain sums in lieu of taxes to the state of Iowa and to the county, city, town, school district and other political subdivisions."

Plaintiff also questions the resolutions and actions of defendant City of Mt. Pleasant to finance the construction of a new industrial plant near the city under a plan to issue $650,000 industrial development revenue bonds pursuant to the provisions of chapter 247.

From the trial court's judgment upholding the Act in its entirety, approving the city's actions and denying plaintiff the relief sought, he has appealed.

On November 20, 1963, the city council of Mt. Pleasant adopted a resolution calling for a special election on the proposi-

tion of issuing $650,000 industrial development revenue bonds. It provides that any revenue bonds which may be authorized by the voters shall be payable solely from the project revenues as required by section 3, chapter 247.

The council in the preamble of this resolution stated preliminary arrangements to locate a Vega Industries, Inc., industrial plant within eight miles of Mt. Pleasant had been made. It found local capital was not available for the project, such a plant would alleviate existing unemployment and would serve the best public interest. Evidence on the trial was offered to establish the arrangement with Vega and the findings of the council.

After an extensive promotional campaign the election on the proposition was held December 17, 1963. It carried by 1005 yes to 29 no votes.

The Mt. Pleasant city council adopted a resolution on February 5, 1964, which authorized acquisition of land, construction of a manufacturing plant, issuance of industrial development bonds and execution and delivery of a mortgage to secure them. It also provided for the acceptance of an assignment of a construction contract entered into originally by the Henry County Industrial Development Corporation and for reimbursement of this corporation for moneys advanced by it to initiate the construction of the plant.

It also provided for execution and acknowledgment of a mortgage and indenture of trust, designating the Central National Bank and Trust Company of Des Moines as trustee. Under the resolution and proposed mortgage proceeds from sale of the bonds are to be used in acquiring title to certain real estate within eight miles of the Mt. Pleasant city limits (as required by section 2(1) of chapter 247) and in constructing thereon an industrial building meeting the specifications of Vega. Proceeds from the sale of the bonds are to be deposited with the trustee and held as the "construction fund". All costs for the land, building construction and related costs are to be paid by the trustee from this fund.

This resolution also approved an agreement with Carleton D. Beh Company for the sale of the bonds.

The preamble of this resolution recited the location of this

industrial plant in the agricultural area around Mt. Pleasant would avoid low wages and unemployment.

Another resolution adopted by the city council on February 5 provided for approval of a lease with Vega and pledge of the lease and rentals therefrom to secure the bonds. The proposed lease provides the industrial plant is to be rented to Vega from March 1, 1964, to September 1, 1980. The basic rent schedule is for an amount sufficient to pay interest on the bonds and the principal thereof as they mature. Under the schedule the principal of all bonds would be paid by September 1, 1980.

The lease also requires payment as additional rent a sum equal to the amount of tax which the state, county, city, school district or other political subdivision would receive if the property were owned by any private person or corporation.

It also requires the lessee to pay all costs, expenses, liabilities, obligations and other payments of whatever nature which the city has agreed to pay or assume under the provisions of the lease and agreement.

Vega, by the terms of the lease, also agrees to pay expenses of any paying agents for the bonds and the charges and expenses of the trustee as provided in the indenture.

The lease further provides that at its expiration on September 1, 1980, it may be extended for two ten-year periods, each at a basic rental of $100 per annum, being otherwise subject to the terms and conditions governing the original period. The proposed lease also grants Vega options to purchase the land and building included in the project at the end of the original term or any renewal period, provided all bonds have been retired or sufficient funds furnished to do so.

The proposed mortgage and indenture of trust provides that all rents and other revenues are to be pledged by the city to the trustee.

The council proceedings contemplate the project will cost not to exceed $650,000 and any excess costs shall be paid by the lessee. Vega is required to furnish machinery, equipment and trade fixtures. These items are to be separately identified and included in the mortgage to the trustee although paid exclusively

from funds provided by the lessee and not from the issuance and sale of the revenue bonds.

It is provided in the proposed mortgage, the proceedings authorizing the issuance of the bonds and on the face of the bonds that they shall never constitute "general obligations of the City nor an indebtedness of the City within any constitutional or statutory limitation, * * * and do not constitute nor give rise to a pecuniary liability of the City or a charge against its general credit or taxing powers". It is expressly provided the bonds are "special obligations payable solely from revenues derived from the Project".

Construction of the industrial building is to be initiated by the Henry County Development Corporation, a private incorporated body, acting on behalf of the city and pursuant to an understanding with the city. The development corporation is to advance funds to initiate the project and no public letting of the construction contract is contemplated. At the appropriate time and when funds become available from the sale of the revenue bonds the construction contract is to be assigned to the city and it is to reimburse the development corporation for all moneys expended and assume the responsibility for the completion of construction.

Under the contract with the city Carleton D. Beh Company agrees, among other things, to assist the city, industry, and bond attorneys, in financial sections of the test case to be submitted to this court, to assist in the preparation of a satisfactory lease and to recommend a maturity schedule, etc., for the proposed bond issue most advantageous to the city. In return the city grants to the Carleton D. Beh Company the exclusive right to buy the revenue bonds.

The trustee is required to act as bond register. It is the duty of the trustee to cancel all bonds together with unmatured coupons which have been redeemed. It can order the city to have the city's books and accounts (insofar as they relate to the project) audited by an independent certified accountant. The trustee's consent is essential to the amendment or modification of the lease agreement. Power is granted the trustee in its name or in the name of the city to enforce all rights of the lessor and all

obligations of the lessee under this agreement for and on behalf of the bondholders. The trustee is under a duty to set up certain funds including a "Bond Fund", a "Bond Fund Reserve Account" and a "Construction Fund". There is imposed upon the trustee a duty to invest any funds not needed to meet current obligations. All rentals, both basic and additional, are to be paid to the trustee, and it is made the obligation of the trustee, out of the funds coming into its hands and from the appropriate account, to pay principal and interest on the bonds. All proceeds from the sale of the revenue bonds are to be paid into the hands of the trustee. It is the duty of the trustee to pay from the construction fund the various expenses and costs in the construction of the building. In the event of default the trustee may, and upon request of the holders of 25 percent in aggregate principal amount of the bonds outstanding must, declare the principal of all bonds then outstanding, together with the interest accrued thereon, immediately due and payable. In the event of default, the city, upon demand of the trustee, shall surrender to the trustee the actual possession of the property, and the trustee is given power to lease the property and to collect and receive the rentals and apply the same upon the obligations. The trustee, in the event of default, is given power to bring actions at law or in equity to enforce payment of principal and interest, including foreclosure actions. Under appropriate circumstances the trustee is entitled to appointment of a receiver.

We, like the trial court, take judicial notice that for many years there has been a continuing and discouraging decline in the population of the rural area surrounding Mt. Pleasant, agriculture is no longer as dominant and significant a factor in the Iowa economy as it was a few generations ago and that many people are moving from Iowa farms and smaller towns because of a lack of adequate opportunities to earn a living.

We agree with the trial court's findings the evidence shows a lack of available local capital from individuals, banks or other lending institutions to finance the project and that it will tend to stabilize the population of Mt. Pleasant.

Plaintiff's petition alleges in detail various grounds for declaring chapter 247 unconstitutional, for holding inadequate

the statutory provisions therein and for finding the proceedings of the city fatally defective. He assigns as error each and every adverse ruling of the trial court. We shall attempt to state and determine the many issues raised as we are well aware not only Mt. Pleasant but many other Iowa municipalities are interested in promoting new industries under the provisions of chapter 247.

The judicial branch of the government has no power to determine whether legislative Acts are wise or unwise, nor has it the power to declare an Act void unless it is plainly and without doubt repugnant to some provision of the Constitution. Merchants' Union Barb Wire Co. v. Brown, 64 Iowa 275, 20 N.W. 434. There is no presumption against constitutional validity of a statute. Every reasonable presumption must be called to support the Act. Plaintiff must overcome these presumptions and negative every reasonable basis which may sustain the statute. Diamond Auto Sales, Inc. v. Erbe, 251 Iowa 1330, 1335, 105 N.W.2d 650, 652; Edge v. Brice, 253 Iowa 710, 716, 113 N.W.2d 755, 758; Iowa Hotel Assn. v. State Board of Regents, 253 Iowa 870, 876, 114 N.W.2d 539, 543.

I. Plaintiff's first contention is that chapter 247 violates Article VII, section 1, of the Iowa Constitution which, so far as material here, reads: "The credit of the State shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation; * * * ."

Chapter 247, section 3, paragraph 1, expressly provides that revenue bonds issued under the Act "shall not constitute nor give rise to a pecuniary liability of the municipality or a charge against its general credit or taxing powers."

Like attacks on similar statutes have been made in several other states. A split of authority has resulted. Faulconer v. City of Danville, 313 Ky. 468, 232 S.W.2d 80; Holly v. City of Elizabethton, 193 Tenn. 46, 241 S.W.2d 1001; Bennett v. City of Mayfield, Ky., 323 S.W.2d 573; Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629; Village of Deming v. Hosdreg Co., 62 N. M. 18, 303 P.2d 920; McConnell v. City of Lebanon, 203 Tenn. 498, 314 S.W.2d 12; In re Opinion of the Justices, 256 Ala. 162, 53 So.2d 840, each holds such a statute constitu-

tional. Contrary rulings are made in State ex rel. Beck v. City of York, 164 Neb. 223, 82 N.W.2d 269, and Village of Moyie Springs v. Aurora Mfg. Co., 82 Idaho 337, 353 P.2d 767.

The reasoning in what seems to be the majority rule as expressed in the first group of cases is more logical. Faulconer v. City of Danville, supra, at page 474 of 313 Ky., page 84, 232 S.W.2d, states:

"Another question raised is that the scheme constitutes a device for the lending of credit of the municipality to a private corporation, in violation of Section 179 of the Constitution, which declares, 'the General Assembly shall not authorize any county or subdivision thereof, city, town or incorporated district * * * to loan its credit to, any corporation, association or individual, except * * * .'

"We think the foregoing consideration, that the venture does not involve the use of tax revenues, presently or in the future, answers this suggestion. It is expressly stated in the statute, ordinance and bonds, that they do not constitute an obligation of the city. Nor is there any lending of credit in other form. There is only the lending of the city's name and its commitment to render the described services and to lease the property for a consideration, which is so valuable that the city is acquiring and will have title to property, unencumbered by a mortgage or lien, of the value of $300,000. The public treasury cannot be opened under the present statute, ordinance or contracts. The city's hand collects and dispenses the rents. It becomes a trustee but not a creditor or guarantor."

In Grout v. Kendall, 195 Iowa 467, 472, 473, 192 N.W. 529, 531, which interprets and defines the meaning of section 1 of Article VII, we say:

"What is meant herein by a loan of credit? * * * This particular section of our Constitution was taken bodily from the Constitution of New York. As a part of the Constitution of New York, it was the result of past experience in the history, not only of New York, but of other states as well, whereby aspiring new states had loaned their credit freely and extravagantly to corporate enterprises which had in them much seductive promise of public good. These enterprises included railways,

canals, water powers, etc. The corporate body in each case was the primary debtor; the state became the underwriter; it loaned its credit always with the assurance and belief that the primary debtor would pay. Pursuant to these secondary liabilities, the state became overwhelmed with millions of dollars of indebtedness which never would have been undertaken as a primary indebtedness, and which never would have been permitted by public sentiment if it had been known or believed that the secondary liability would become a primary one through the universal failure of the primary debtor. The ultimate cry of the surety is: 'I would not have become surety if I had known or believed that I should have to pay the debt.' This is as true of states as of individuals. It was to remove this delusion of suretyship, with its snare of temptation, that this section of the Constitution was adopted. It withheld from the constituted authorities of the state all power or function of suretyship."

See also Merchants' Union Barb Wire Co. v. Brown, 64 Iowa 275, 20 N.W. 434; Edge v. Brice, 253 Iowa 710, 113 N.W.2d 755.

Here the city assumes neither primary nor secondary liability in anyway. Plaintiff's first contention is without merit.

II. Plaintiff's second contention is that chapter 247 violates section 29, Article III, of the Iowa Constitution because it embraces more than one subject and matters (land and equipment) not expressed in the title. Section 29, as material, provides: "Every act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title."

We have consistently held this section of the Constitution should receive a broad and liberal construction, and not a narrow, technical, critical construction. Independent School Dist. v. Iowa Employment Sec. Comm., 237 Iowa 1301, 1312, 25 N.W.2d 491, 498; Knorr v. Beardsley, 240 Iowa 828, 856, 857, 38 N.W.2d 236, 252; Doyle v. Kahl, 242 Iowa 153, 157, 46 N.W.2d 52, 54.

In Fevold v. Board of Supervisors, 202 Iowa 1019, 1034, 210 N.W. 139, 145, we said:

"It is the uniform rule that this constitutional requirement

is not to be given a narrow or limited construction. It is not intended to prohibit the writing in one bill of any number of provisions having one general object, fairly indicated by the title; and it is not necessary that the title shall be an index of the details of the act, nor that every provision of the several sections of the statute be enumerated in the title."

The details as to land and construction of improvements are germane to the title of chapter 247. We find no merit in plaintiff's second contention.

III. Plaintiff next contends section 1, paragraph 2 of chapter 247, violates section 6, Article I of the Iowa Constitution "because it permits those engaged in manufacturing, processing or assembling agriculture or manufactured products to borrow money for plant facilities at a lower rate than others who cannot qualify under the Act."

Section 6, Article I provides:

"All laws of a general nature shall have a uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens."

The trial court's adverse ruling is completely supported by Diamond Auto Sales, Inc., v. Erbe, 251 Iowa 1330, 1339, 1340, 105 N.W.2d 650, 654, 655, which states:

" 'It is fundamental this constitutional provision [section 6 of Article I, supra] does not require that all laws shall apply alike to all citizens of the state. It is sufficient if a statute applies equally to all members of a class, provided the classification is not purely arbitrary but rests upon some reasonable basis. It is equally settled the legislature has wide discretion in determining the classes to which its Acts shall apply. Cook v. Hannah, 230 Iowa 249, 253, 297 N.W. 262, 265, and citations; Dickinson v. Porter, supra, 240 Iowa 393, 401, 35 N.W.2d 66, 72; Thomas v. State, 241 Iowa 1072, 1080, 1081, 44 N.W.2d 410, 414, 415.'

"The rule is thus stated in Dickinson v. Porter, supra, pages 400, 401 of 240 Iowa, page 72 of 35 N.W.2d: 'If there is any reasonable ground for the classification * * * and it operates equally upon all within the same class, there is uniformity in the

constitutional sense and no violation of any constitutional provision invoked by plaintiff.' Authorities in support are cited immediately following. Nor is it sufficient that the court may regard the reason for the classification as weak, or poor, or that the differences upon which it is based are not great or conspicuous. Dickinson v. Porter, supra at page 401 of 240 Iowa, page 72 of 35 N.W.2d; 16A C. J. S., Constitutional Law, section 520, page 382."

IV. Plaintiff next attacks section 11 of chapter 247 which reads:

"Any municipality acquiring, purchasing, constructing, reconstructing, improving or extending any industrial buildings, as provided in this Act, shall annually pay out of the revenue from such industrial buildings to the state of Iowa and to the city, town, school district and any other political subdivision, authorized to levy taxes, a sum equal to the amount of tax which the state, county, city, town, school district or other political subdivision would receive if the property were owned by any private person or corporation, any other statute to the contrary notwithstanding."

He argues it violates section 30, Article III, of the Iowa Constitution as it amounts to a special law for the assessment of taxes for state and county purposes. He also asserts section 11 violates section 7, Article VII, as it attempts to impose a tax by reference to other laws levying taxes on property owned by private persons or corporations.

The obvious answer to these contentions is that section 11 does not impose, continue or revive a tax. The legislature does protect the taxing bodies from loss of tax revenue by requiring additional rental.

V. Plaintiff argues the plan for the city to take over the project started by Henry County Industrial Development Corporation violates section 3, Article VIII, of the Iowa Constitution which prohibits the state from assuming or paying the debt or liability of any corporation.

The evidence shows the development corporation was formed and brought into the plan only to get the project started and

avoid its loss during the necessary time to test chapter 247 through the courts.

No tax money goes toward the payment of any expense incurred by the development corporation. The city has no responsibility beyond application of the proceeds from the revenue bonds. The trial court ruled correctly on this contention.

VI. By amendment to his petition plaintiff raised three more constitutional questions: (1) That chapter 247 violates section 31, Article III, of the Constitution of Iowa, which prohibits appropriation of public money or property without the approval of two thirds of each branch of the General Assembly, (2) chapter 247 violates section 9, Article I, of the Iowa Constitution, and also Amendment 14 to the Constitution of the United States, which provide no person shall be deprived of property without due process of law, and (3) that plaintiff and other tax-paying citizens of Mt. Pleasant are deprived of property without their consent.

Our rulings already made demonstrate each of these contentions is without merit.

VII. Plaintiff next attacks chapter 247 on questions of public policy. He argues it is against public policy because (1) it provides for use of public money for private purpose, (2) it contains no standards or means to determine whether a given project does in fact constitute a public purpose, (3) it contains no declaration such projects are in the public interest, (4) the only reason a private corporation might wish to finance a plant would be to take advantage of the ability of the municipality to borrow money at a lower rate of interest, and (5) the grant of an option to purchase the plant is an invalid restriction on the city's duty to sell its property at the best price obtainable.

The first two claims are best answered in Faulconer v. City of Danville, supra, 313 Ky. 468, 471, 472, 232 S.W.2d 80, 82, 83, which states:

"In enacting the statute under which the present venture is undertaken, the legislature deemed the acquisition and ownership by a city of an 'industrial building' to be a public project. The legislative determination of what is a public purpose will not be interfered with by the courts unless the judicial mind conceives

it to be without reasonable relation to the public interest or welfare and to be without the scope of legitimate government. The concensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. 37 Am. Jur., Municipal Corporations, section 132. It reaches perhaps its broadest extent under the view that economic welfare is one of the main concerns of the city, state and the federal governments. This is manifested by the great bulk of recent social security programs of the nation and the state. Of special pertinence are those providing for unemployment insurance and security, thus decreasing what the Tennessee Supreme Court calls 'unemployment's twin offspring, hunger and crime.' Azbill v. Lexington Manufacturing Co., Tenn. Sup., 221 S.W.2d 522, 524. With reference to this concern of government, Mr. Justice Stone, later Chief Justice, writing for the Supreme Court, in holding constitutional an Alabama statute levying taxes and providing for their use, said: 'The evils of the attendant social and economic wastage permeate the entire social structure. Apart from poverty, or a less extreme impairment of the savings which afford the chief protection to the working class against old age and the hazards of illness, a matter of inestimable consequence to society as a whole, and apart from the loss of purchasing power, the legislature could have concluded that unemployment brings in its wake increase in vagrancy and crimes against property, reduction in the number of marriages, deterioration of family life, decline in the birth rate, increase in illegitimate births, impairment of the health of the unemployed and their families and malnutrition of their children.' Carmichael v. Southern Coal & Coke Co., 301 U. S. 495, 57 S. Ct. 868, 875, 81 L. Ed. 1245, 109 A. L. R. 1327. See also Spahn v. Stewart, 268 Ky. 97, 103 S.W.2d 651; Shaw v. Kentucky Unemployment Compensation Commission, 297 Ky. 815, 181 S.W.2d 697.

"All these social security enterprises—including low-cost housing, old age insurance and special care of the blind and needy children—all, are illustrative of the modern concept of public purpose. They are in their nature preventive of conse-

quences always recognized as subjects and objects of public concern."

Plaintiff argues the city may lose a valuable asset in event of foreclosure. He fails to point out how this would be possible. The city will have paid nothing for the project. The loss, if any, is to the industry and the bondholders, not the city.

In addition to what is said in the Faulconer case a casual reading of chapter 247 reveals the purpose of the General Assembly was to promote the general interest and serve the public purpose. The fact it is not stated in so many words is of no importance.

Vega's reasons why they desired to enter into the arrangement are immaterial. If the project will serve the public purpose constitutional requirements are met.

A contention such as made in ground 5 above is held without merit in Bennett v. City of Mayfield, supra, Ky., 323 S.W.2d 573 at page 575, where it is said:

"The option provision in the present plan injects a new feature. In other cases of this class it appears title to the property remained in the city and became free of the lien whenever the bonds became fully paid. It will be otherwise in this case if the lessee elects to exercise the option. The city will then have nothing tangible. But it started out on the venture with nothing. Meanwhile, the city will have had the benefits arising from a large local enterprise and the community will in the future have that, plus the taxes on the property."

We hold the attacks on chapter 247 on questions of public policy are also without merit.

VIII. Plaintiff next raises numerous statutory questions. The first is that the bonds issued pursuant to chapter 247 constitute debts of the city within the constitutional and statutory debt limitation provisions and are therefore chargeable against the debt incurring capacity of the city.

Iowa Hotel Assn. v. State Board of Regents, 253 Iowa 870, 114 N.W.2d 539, disposes of such an attack on chapter 185 of the Acts of the Fifty-eighth General Assembly relating to "Self-Liquidating College Buildings". Under this Act the Board of Regents was authorized to collect from students certain fees and

charges to be applied upon the cost of acquiring, constructing, maintaining and financing certain improvements on the campuses of institutions of higher learning of this state. The board was authorized to borrow money on the credit of the income to be received from the operation and use of the facilities so constructed and from the fees and charges made to the students. The law expressly provided that no obligation created thereunder should become a charge against the state. The hotel association, among other things, contended this Act was unconstitutional because the proposed financing would create a debt prohibited by the constitution. In holding no debt was created we said:

"If the proposed plan of financing creates a debt of the state, it contravenes the Constitution and must be enjoined. A debt can be incurred only as authorized. Hubbell v. Herring, supra [216 Iowa 728, 249 N.W. 430]. The provisions of the Constitution are mandatory and as binding on the legislative branch of the government as on the citizens. Taft Co. v. Alber, 185 Iowa 1069, 171 N.W. 719.

"It should be kept in mind that the constitutional prohibition relates to debts 'contracted by, or on behalf of this State.' In this case we are not concerned with what might be the authority of the Board of Regents in the absence of enabling legislation. The board in this case is acting within the scope of legislative authority and while so acting is limited thereby. The undertaking of the Board of Regents is not a debt for which the state is responsible because the enabling statute so provides. Section 6, chapter 185, Laws of the Fifty-eighth General Assembly, says: 'No obligation created hereunder shall ever be or become a charge against the state of Iowa * * *.' There is no appropriation under the law. There is no obligation, express or implied, by or in behalf of the state. The state does not promise to pay. There is no alternative procedure by which the state would be required to pay. The state, speaking through the legislature, says that no one may obligate the state to pay. When the enabling Act specifically negatives any charge against the state, there is no state debt within the meaning of the Constitution." Loc. cit. pages 877, 878, 253 Iowa, pages 543, 544, 114 N.W.2d.

IX. Plaintiff's petition beginning with numbered paragraph 13 and continuing through paragraph 39 raises statutory questions and claimed defects in city proceedings. The trial court carefully and ably considered each in the order raised. Plaintiff assigns his claimed errors as to these paragraphs in the same order. We agree with the trial court's reasoning and conclusions and therefore adopt and approve them. The trial court's conclusions state:

"In ground 13 of plaintiff's petition this attack is made: 'That paragraph 3 of section 3 of chapter 247 would require that taxes be levied pursuant to chapter 76 of the Code, to pay the bonds and interest.'

"Paragraph 1 of section 3 of chapter 247 expressly provides that the bonds and interest coupons 'shall not constitute nor give rise to a pecuniary liability of the municipality or a charge against its general credit or taxing powers.' At no place in chapter 247 is authority granted to levy taxes to pay the principal or interest of revenue bonds. The exact contrary is the case. Paragraph 3 of section 3 of chapter 247 makes applicable general provisions of the law with respect to the execution and delivery of municipal bonds issued under this chapter and with respect to the retaining of options of redemption on these bonds. None of the other general provisions of the law with reference to bonds is made applicable by paragraph 3 of section 3.

"Plaintiff alleges in ground 14 of his petition that paragraph 3 of section 3 is vague and indefinite and unworkable because the provisions therein contained purport to include the provisions of other bond laws by reference without specific identification and without reenacting such other statutory provisions. This court cannot agree that paragraph 3 of section 3 is vague. This paragraph clearly and specifically identifies those general provisions of the law which are applicable to this chapter, to-wit: with respect to execution of bonds by a municipality, with reference to the delivery of bonds of a municipality and with respect to the general provisions of the law relating to the retention of options of redemption. The only thing omitted from section 3 is the numbers of code sections to which reference is made. Surely this is not necessary.

 "Plaintiff in ground 15 of his petition claims that the building and leasing of a plant outside the city limits of Mt. Pleasant is ultra vires. The court would once again refer to Bennett v. City of Mayfield, supra, in which this statement appears at pages 574 and 575 of 323 S.W.2d:

" 'The industry will be located near but outside the city limits. A question is raised as to the authority of a municipality to engage in such a venture under that condition. The industry in the Danville case was also outside the city limits, and while not discussed, it is implicit in the opinion that the court regarded the action as not ultra vires. The subject of power of a city to own and use property located beyond its corporate limits was considered with some elaboration in Smith v. City of Kuttawa, 222 Ky. 569, 1 S.W.2d 979. We held that there was no legal reason why a municipality may not acquire and hold property so located for useful and legitimate city purposes.'

"Attention is also directed to Smith v. City of Kuttawa, 1 S.W.2d 979 (Ky.), and to Schneider v. City of Menasha, 95 N.W. 94 (Wis.), wherein it is held that a wide range of discretion must be granted a city in going a reasonable distance beyond its corporate limits for the purpose of carrying out its proper and legitimate functions. Within the range granted by the exercise of sound discretion the city does not commit an ultra vires act by going beyond its corporate limits. Nor is a statute which authorizes a city to go a reasonable distance beyond its corporate limits invalid. See also State v. City of Pittsburg, 364 P.2d 71 (Kan.) at pages 78 and 79.

 "Plaintiff then contends in grounds 16 and 17 of his petition that section 2 of chapter 247 is vague and indefinite because it provides no standard or means of determining whether or not local capital is available; and whether the words 'local capital' shall be construed to mean local capital which may be borrowed at as low a rate as bonds with tax exempt interest or means local capital ordinarily available at commercial rates.

 "This court feels that plaintiff is making mountains out of molehills. The words 'local' and 'capital' have definite meanings. The word 'local' can be defined as relating to or occupying a particular place; not general, or wide spread, as local

government. Webster's New International Dictionary, Second Edition, p. 1449. The word 'capital' as used in section 2 of chapter 247 means a stock of accumulated wealth. Webster's New International Dictionary, Second Edition, p. 397. The words 'local capital', as used in chapter 247, do not refer only to capital available locally at the rate of interest for tax exempt bonds. It is the opinion of this court that these words mean an accumulation of wealth within an Iowa community available for industrial development at the normal commercial rate of interest. A determination as to the availability of such capital can properly be made by the governing body of a municipality and in the manner outlined by E. A. Hayes in his testimony given in this cause.

"In ground 18 plaintiff contends the property held by the city for the industrial purposes outlined in the proceedings of the city council will not be exempt from taxation under the provisions of section 427.1(2) of the 1962 Code of Iowa because the property is not 'devoted to public use' but is used instead for pecuniary profit by a private corporation. The court would observe that the whole emphasis of several of the cases heretofore cited including Holly v. City of Elizabethton, supra; Faulconer v. City of Danville, supra; and Bennett v. City of Mayfield, supra, is to the effect that legislative enactments, such as chapter 247, serve a public purpose and promote the general public welfare and that the advantages to the particular industry are merely incidental. Since these statutes, according to the overwhelming weight of authority, do serve a public purpose and promote the public welfare, the ownership and use of the facilities would certainly fall with the classification of a public use. Wayland v. Snapp, 334 S.W.2d 633 (Ark.).

"In the Wayland case a question arose as to the status for the purposes of taxation of land and manufacturing facilities to be acquired by a city and county in Arkansas, pursuant to a statute which authorized the issuance of bonds and the development of new industries. The plant in question was to be occupied by the Seiberling Rubber Company, Inc. So far as material to a ruling in the Wayland case the Arkansas Constitution required that for property to be exempt from taxation it must be public

property and must be used exclusively for public purposes. At pages 641 and 642 of 334 S.W.2d, the Arkansas court said:

"'(a) It must be admitted here that the grounds, the building and facilities will be owned by the City of Batesville and will, therefore, be public property.

"'(b) Likewise, we think it is clear that the property will be used exclusively for a public purpose. If it is, it will be exempt from taxation under the Constitution and if it is not it must be taxed. After careful thought and consideration we cannot escape the conclusion that the whole purpose, and the only purpose, for the adoption by the people of Amendment No. 49, the passage by the Legislature of Act No. 9, and the efforts of the people of Batesville and Independence County (in attempting to implement said Amendment and said Act) was for the public welfare—obviously and undoubtedly a "public purpose". This result would follow only where the title to property is acquired and the property itself is used by a city or county (or by both) pursuant to Act No. 9 and/or Amendment No. 49.

"'It cannot be said that any part of the entire program was meant for any other purpose, and certainly not for the purpose of benefiting Seiberling. Any benefit Seiberling may receive from this entire undertaking will be entirely incidental it seems to us.'

"As having some bearing on this question see City of Muscatine v. Swickard, 232 Iowa 1175, 6 N.W.2d 23.

"Ground 19 of plaintiff's petition sets forth a further attack on section 11 of chapter 247. It is alleged in this objection that there are no adequate standards, rules, regulations or procedures in said section 11 for determining the amount of the tax equivalent. It would seem to this court this is one of the lesser problems presented by chapter 247. In all counties in Iowa provisions are made for the appraisal and assessment of property for tax purposes and certain standards for doing so have been worked out. It would seem a comparatively simple matter to place an assessed value on a property of the kind contemplated for Vega. It certainly can be no more involved than assessing any other industrial property. Once a valuation is placed upon the property it is an equally simple chore to apply the various

tax rates to the valuation for the purpose of determining the tax equivalent.

"In ground 20 of his petition plaintiff alleges section 11 will provide for double the actual amount of taxation attributable to this property. This claim proceeds upon the theory that the property would not be entitled to exemption from taxation under section 427.1(2) of the 1962 Code of Iowa. But as pointed out by the court in these conclusions the property will be devoted to a public use and will not be subject to taxation. Whether double taxation is permissible or not is unimportant here.

"Plaintiff also contends (ground 21) that paragraph 2 of section 2 of chapter 247 is vague and indefinite and there are no standards or procedures for determining the average rental cost per square foot for like or similar facilities in the commercial competitive area. This court takes judicial notice of the fact that within a distance of fifty miles from Mt. Pleasant there are four cities in which there are substantial commercial and industrial developments. These cities are Fairfield, Fort Madison, Keokuk and Burlington. In each of these four cities there are rented plants and commercial sites bearing some similarity to the plant proposed for Vega and housing industries which are to some degree like Vega. With these industrial facilities located in the cities above named there would appear to be no problem in determining with a reasonable degree of certainty the average rental cost per square foot for like or similar facilities.

"Paragraph 2 of section 2 of chapter 247 is clearly workable in the Mt. Pleasant community and would appear to be workable in all communities of this state.

"It is plaintiff's contention in ground 22 of his petition the option to purchase the plant is contrary to the provisions of section 3 of chapter 247, which requires that bonds be payable 'solely' out of the revenues of the project. It would be this court's opinion that the word 'solely' as used in said section is intended primarily, if not entirely, for the protection of the municipality from any charge against its general credit or taxing powers. This conclusion is supported by Bennett v. City of May-

1210

field, supra, at pages 576 and 577 of 323 S.W.2d where the Kentucky court states:

" 'The statute, KRS 103.230, contains the statement that, "The bonds shall be payable solely from the revenue derived from the building." The appellant submits there is no authority for the payment of the bonds from the proceeds of a sale of the property. We think a construction of the statutory provision as meaning that the bonds may not be paid from other funds derived from the project and the property is too restrictive. The quoted clause is followed by the statement, "and shall not constitute an indebtedness of the city within the meaning of the Constitution." It seems apparent that the statement was intended to make certain that bond holders have no claim on funds raised or to be raised by taxation.'

▬▬▬ "In ground 23 plaintiff objects to the provision in the council proceedings which contemplates the payment of a premium upon the redemption of bonds before maturity. Plaintiff claims there is no specific provision in chapter 247 permitting this to be done. However, it is clearly the contemplation of the Act that the council proceedings, the bonds and the mortgage given to secure the bonds may contain all provisions customarily included in instruments securing bonds. Attention is directed to paragraph 2 of section 4 of chapter 247 where it is stated that 'The proceedings under which the bonds are authorized to be issued under the provisions of this Act, and any mortgage given to secure the same, may contain any agreements and provisions customarily contained in instruments securing bonds, including, but not limited to * * *.'

"Certainly provisions for redemption of bonds before maturity and for the payment of a premuim for the privilege are customary and fall safely within the provisions of paragraph 2 of section 4.

▬▬▬ "In ground 24 plaintiff complains that the election was not called pursuant to a petition as contemplated by section 408A.2 of the Iowa Code. In view of this claim attention must be directed to section 9 of chapter 247 which reads as follows:

" 'Prior to the issuance of any bonds under authority of this

Act, the municipality shall provide for an election as provided in chapter four hundred eight A (408A) of the Code.'

"Does this section contemplate there must be filed a petition as provided in section 408A.2 before the council can call an election? The court believes not. It seems to this court that section 9 of chapter 247 is a substitute for the petition provided for in section 408A.2. Section 408A.2 applies only where there is no duty imposed upon the council to call an election in the absence of a petition. However, section 9 imposes that duty without reference to a petition. In the absence of such a provision as section 9 of chapter 247 the filing of a petition in compliance with section 408A.2 is a necessary catalysis. Under chapter 247 section 9 is itself the catalysis.

"When chapter 408A is considered in connection with section 9 of chapter 247 the court is satisfied that an election was properly called by the council without the filing of a petition.

"Then in ground 25 plaintiff claims there is a violation of section 76.6 of the Code of Iowa because the bond principal and interest are payable at a Des Moines bank rather than at the office of the city treasurer of Mt. Pleasant, Iowa. It should be noted that paragraph 2 of section 3 of chapter 247 expressly provides that the bonds, both as to principal and interest, shall be payable at such place or places as the governing body may provide. The city council in this instance has provided that the place of payment of principal and interest shall be at the Des Moines bank. It is well established that terms of a statute relating to a particular subject will prevail over the general terms of another statute. This is especially true in this case because chapter 247 was enacted after the adoption of section 76.6. United States v. Windle, 158 F.2d 196 (C. C. A. 8th Cir., 1946); State v. County of Lancaster, 113 N.W.2d 63 (Neb.), at page 69.

"Ruling on ground 26 of plaintiff's petition will be set out later in these conclusions.

"In grounds 27, 28 and 29, plaintiff is concerned about the use of the disjunctive word 'or'. He points out that in paragraph 1 of section 4 of chapter 247 it is provided that the bonds may be secured by a mortgage *or* by a pledge of the lease, that in paragraph 3 of section 4 of chapter 247 it is provided

that the receiver may apply revenues in accordance with such proceedings *or* the provisions of the mortgage, and in section 7 of chapter 247 it is specified that the costs of the project shall include cost of acquiring the site *or* the cost of construction. He points that the council proceedings contemplated that the bonds will be secured by both a mortgage *and* a pledge of the lease, that the receiver may apply the revenues of the property in accordance with both the proceedings *and* the provisions of the mortgage, and that the costs of the project shall include both the cost of the site *and* the cost of the construction of the building.

"These complaints present no great difficulty. The rule applicable is laid down in State v. Hardin County Cooperative, 226 Iowa 896, 285 N.W. 219, at page 916, 226 Iowa, in the following language:

" 'It is a well-known rule of statutory construction that the courts will construe disjunctive words as conjunctive, and vice versa, and will disregard technical rules of grammar and punctuation, when necessary to arrive at the intent of the legislative body.'

"The legislative intent in the paragraphs and sections of chapter 247 now under consideration is plain. In each instance in order to give effect to the legislative intent, the disjunctive 'or' shall be construed as the conjunctive 'and'. It would be preposterous, for example, to say that the cost of the project should include only the site and not the construction of the building, or only the cost of the construction of the building and not the site. Accordingly, it is determined that the word 'or' appearing in line 5 of paragraph 1 of section 4 of chapter 247 shall be construed to mean 'and'; that the word 'or' appearing in line 8 of paragraph 3 of section 4 of said chapter shall be construed to mean 'and'; and that the word 'or' appearing in line 8 of section 7 of said chapter shall be construed to mean 'and'.

▉▉▉▉ "In ground 30 of his petition plaintiff calls attention to the fact the proposition submitted to the voters provided for the issuance of bonds to pay the cost of construction of a building and he contends the arrangements which the city has with the Henry County Development Corporation actually result in the issuance of bonds for purchasing a building. It would have been

better if the proposition submitted to the voters had provided not only for the construction of a building but also for the acquisition of a building by purchase, gift or lease. (See paragraph 1 of section 2 of chapter 247.) However, the court believes the question is not here important. Really what the city of Mt. Pleasant is doing in making this arrangement with the local development corporation is providing for the construction of a building on its behalf. Under the arrangement the development corporation is acting as representative and agent for the city in the construction of the building, and in connection with this construction the development corporation is authorized to incur certain obligations and is entitled to receive reimbursements out of proceeds of the sale of revenue bonds. It is the court's opinion the arrangement with the development corporation is actually one for the construction of a building by the city through its representative.

"In ground 31 plaintiff raises one of the most serious contentions made in this action. Therein, he alleges that the plan of the city of Mt. Pleasant for the construction of the industrial building violates the provisions of chapter 23 of the Iowa Code which require a public hearing on plans and specifications for public improvements, and for competitive bidding in the awarding of construction contracts. After careful consideration this court has concluded that chapter 23 of the Code is not applicable to the construction of industrial buildings under chapter 247. The provisions of chapter 247 are unique. The industrial project of the city of Mt. Pleasant, authorized by chapter 247, bears little, if any, resemblance to projects which historically have been financed and constructed through funds obtained by the issuance of general obligation or revenue bonds. No funds raised from taxation are being used in the Mt. Pleasant industrial project. A building not for general public use, but for a specialized industry, is planned. Only funds received from the sale of revenue bonds, which bonds are payable solely from the industrial rentals, will be employed.

"Chapter 247 moves municipalities in this state into the field of industrial development. And in industry expediency becomes the keynote. Certain formalities, long honored and required in connection with the construction of strictly public buildings,

must now be limited in their application in so far as projects under chapter 247 are concerned. It would seem from a consideration of the provisions of chapter 247 as a whole that it is the intent of the legislature that the general provisions of the law governing the letting of contracts for public improvements are not applicable. The very question which is here considered was raised in Gregory v. City of Lewisport, 369 S.W.2d 133 (Ky.). In that case the defendant city proposed to issue its industrial revenue bonds in the amount of several million dollars to pay the costs of a plant to be constructed for a certain industry. It was proposed that the industry itself would construct the plant and the city would pay the cost thereof in stages as the work progressed, the money for such payments to be obtained from the sale of the bonds. The question raised was this: 'Is the plan an invalid device to evade statutory requirements for advertisement for bids for construction work by cities and for the payment of prevailing wages on public works projects?' The court held that it was not and at pages 135 and 136 states:

" 'Perhaps it would not be acceptable for a city to contract, before commencement of construction, to buy a building upon its completion, if the only purpose of the plan were to escape statutory regulations governing construction of buildings by cities. But here the plan has a legitimate purpose—to insure that the building will conform to the requirements of the lessee for whose use the building is designed. We think the statutes in question are aimed primarily at construction of buildings for public use, so when, as in the case here, a building is being acquired for use of private industry the courts should not search for possible motives of evasion in the plan for acquisition of the building if the plan does not literally violate the statutes and if it has an apparent legitimate purpose.'

"Plaintiff next claims (ground 32) that paragraph (b) (1) of section 5 of the proposed lease with Vega is vague and unenforceable. It is also contended that if the property is exempt from taxation no public official could be compelled to provide the services necessary to make the provisions workable. Said paragraph (b) (1) closely follows the provisions of section 11 of chapter 247 and what was said in response to ground 19 of plain-

tiff's petition is applicable here. Furthermore, this court cannot agree that public officials would have no duty to provide the information required and to receive and disburse the money. Section 11 of chapter 247 expressly requires that a sum equal to the total of the taxes for the state, county, town and school district or other political subdivision shall be paid. If there exists a statutory duty to make the payment, then there is a lawful obligation upon the proper official or officials to perform those services necessary to the making of the payment.

"In ground 33 plaintiff contends that the lease must be awarded by the city pursuant to public bidding. What was said in response to ground 31 of plaintiff's petition is largely applicable here. It should be pointed out that ordinarily under this Act it will be necessary for a city to have made preliminary arrangements with an industry before it undertakes to purchase or construct a building. Ordinarily, there will be only one applicant for the lease. In all probability the building if constructed will be designed especially for the one applicant. Public bidding on the lease under these circumstances becomes difficult, if not impossible. Nothing in chapter 247 requires a public bidding on the lease.

"It is the court's conclusion that the legislature did not contemplate public bidding on industrial leases under chapter 247.

"In ground 34 plaintiff complains because the proceedings by the city council contemplate the payment of expenses and commissions in connection with the authorization, sale and issuance of the bonds. He contends that section 75.6 of the 1962 Code of Iowa prohibits this. However, it should be noted that paragraph 4 of section 3 of chapter 247 expressly provides that a municipality may pay all expenses, premiums and commissions which it may deem necessary or advantageous in connection with the authorization, sale and issuance thereof. Clearly, said paragraph 4 controls. The provisions of section 75.6, which have general application, cannot be applied here.

"Grounds 35, 36 and 37 of plaintiff's petition are closely related. In ground 35 plaintiff contends the option to purchase the plant for a nominal amount is invalid and a fraud upon the city; in ground 36 he contends the option to purchase

the plant in consideration of the payment of the outstanding bonds is the equivalent of the purchase of the building by installments, with the privilege of borrowing money at a lower rate because of the tax exempt feature of the bonds, and is invalid; and in ground 37 he protests the option to renew the lease for two periods of ten years each at a nominal rate of rental is without adequate consideration, and is invalid and a fraud upon the city.

"In considering these three grounds it must again be noted the primary purpose of chapter 247 is to attract industry to a community, such as Mt. Pleasant, to provide employment and to stabilize the population. It is not the purpose that the city make a profit upon the transaction in order that its own coffers may be filled.

"We have heretofore quoted from Bennett v. City of Mayfield, supra. The statements there made and the quotations there set out are applicable here and the court in addition would call attention to the Alabama case of Newberry v. City of Andalusia, 257 Ala. 49, 57 So.2d 629. There under consideration was a statute in many respects similar to chapter 247. Acting pursuant to this Alabama statute the defendant city had entered into a lease with the Gulf Naval Stores Company which, among other things, granted the company the right to renew the lease at its option for certain additional periods of five years each at a rental of not exceeding $1000. It was contended these options violated a constitutional provision in Alabama against the grant of a thing of value in aid of a private individual or association. In rejecting this contention the court at page 637 states:

" 'A lease of public property without consideration is certainly a violation of section 94, but here we do not have such a case. Under the contract of lease and exhibits thereto the city of Andalusia, in its capacity as owner-lessor, is to lease the project to Gulf Naval Stores Company for a ten-year initial term with the option to extend the term of the lease for successive five-year periods, the total of such terms of extension not to exceed forty years, which, as will hereinafter appear, has been reduced to twenty years. The appellant's contention does not take into account the fact that the options to renew are a part of the present

contract of lease. The lease, with its options to renew for successive five-year periods, is entered into today, not ten years after the completion of the project. The project is required to have an appraised going concern value of at least $1,800,000 upon completion. The City of Andalusia is to furnish from the revenue bonds proceeds not exceeding $1,300,000 which, with interest thereon, is to be fully repaid by lessee by the fixed rental payments. The city contributes not one penny. The contract of lease obligates Gulf Naval Stores Company to build the plant and to pay all construction costs in excess of the $1,300,000. The contract contemplates that it will cost Gulf Naval Stores Company an additional $500,000. There is nothing in the contract to limit Gulf Naval Stores Company's contribution to this figure and, if construction costs should run in excess of the estimate, its contribution to the cost might well run over $500,000. This cost of the project in excess of the city's contribution from bond proceeds, unlike the payment of fixed rentals provided for in the contract of lease, must be paid by the lessee at the outset of the contract as an advance or prepaid expenditure necessary to the subsequent occupancy and use of the improvements.

"'Hence, it is clear that the obligation of the lessee to pay this portion of the cost of construction is, in and of itself, a present consideration for the execution of the lease with its options to renew. Furthermore, as additional consideration for the renewal terms, the lessee is obligated to pay for the maintenance of and insurance on the improvements, not only during the ten-year term of the lease, but during all optional renewal periods as well. We hold therefore that there is no constitutional interdiction which inhibits the city, through its governing body, acting in good faith, from determining that this contract is a fair and reasonable rental for the prescribed period.

"'This court cannot presume bad faith nor will we inquire into the adequacy of consideration for a lease appearing on its face to have been approved in good faith by the governing body of a municipality.'

"This court feels the language of the Bennett and Newberry cases to be most persuasive.

"Plaintiff next contends in ground 38 that the pro-

posed mortgage unlawfully delegates discretionary power to the trustee named therein. A similar contention was made in Gregory v. City of Lewisport, supra. The powers granted to the trustee in the Gregory case were similar to those proposed to be granted to the trustee in the case now under consideration. The court in the Gregory case summarized the financing plan at page 136 of 369 S.W.2d as follows:

" 'The financing plan provides for the designation of an out-of-state bank as escrow agent. The proceeds of the sale of the bonds will be deposited with the agent and disbursed by it. The plan further provides for appointment of an out-of-state bank as trustee of the revenue bond sinking fund. The rentals from Harvey Aluminum will be paid to the trustee and applied by it to retirement of the bonds. The bank named as agent or trustee must have a combined capital and surplus of over $50 million (the amount of the proposed bond issue). The trustee is to be given irrevocable power to accept on behalf of the city all notices, deeds, bills of sale and policies of title insurance. The lease with Harvey Aluminum may be terminated only with the written consent of the trustee, and any new lease or re-lease must be approved by the trustee. Furthermore, the city will agree to be bound by the determinations made by the trustee with regard to any reports, certificates or opinions furnished to the trustee pursuant to the provisions of the lease contract.'

"In holding that there was not an unlawful delegation of discretionary power by the city the Kentucky court at pages 136 and 137 of 369 S.W.2d ruled as follows:

" 'A third question (I) is whether the provisions hereinbefore mentioned as to the powers of the trustee constitute an unlawful delegation of discretionary power of the city. Under the decision in Commonwealth v. Associated Industries of Kentucky, Ky. [370] S.W.2d [584], delegations of power are allowed considerable latitude. But even without regard to that decision we think there actually is no delegation of power here. The city is in the position of a borrower, and the provisions in question are standard for borrowing transactions. A borrower usually has to surrender some of his rights in order to protect the lender. The city here is not surrendering any governmental powers.

What are involved are simply details of a proprietary transaction.'

"This court concludes there is no unlawful delegation of discretionary power to the trustee under the proposed mortgage.

 "Plaintiff is of the opinion (ground 39) that the execution of the lease agreement should have been authorized by ordinance rather than by resolution. The court cannot accept this contention. The approval of these instruments is a ministerial act and can be carried out by resolution. The enactment of an ordinance is ordinarily reserved for the performance of a legislative Act.

 "This court has been particularly concerned with ground 26 of plaintiff's petition wherein complaint is made that the proceedings contemplate a private sale of the revenue bonds in violation of chapter 75 of the 1962 Code of Iowa. Paragraph 4 of section 3 of chapter 247 provides with reference to the sale of revenue bonds under this chapter as follows:

" 'Any bonds, issued under the authority of this Act, *may* be sold at public sale in such manner and at such time or times as may be determined by the governing body to be most advantageous.'

 "No other provisions for the sale of bonds are contained in chapter 247 and nothing is said therein concerning a private sale. It is noted that the word 'may' was employed by the legislature in the above quoted statutory provision. This court is well aware that in statutory interpretation a mandatory construction is rarely placed on the word 'may'. John Deere Tractor Works v. Derifield, 252 Iowa 1389, 110 N.W.2d 560; Downing v. City of Oskaloosa, 86 Iowa 352, 53 N.W. 256.

"However, this court, having been long familiar with the sale of both general obligation and revenue bonds in Iowa, hesitated to consider any sale procedure as proper which did not comply with chapter 75 of the 1962 Code of Iowa. Then this court was also concerned with the fact that chapter 247 was entirely silent concerning a private sale which inclined the court to believe that the legislature contemplated only a public sale and therefore the word 'may' would of necessity be construed to mean 'shall'.

1220

"But after further thought and consideration the court has concluded that a private sale of the industrial bonds by the city of Mt. Pleasant, even without first attempting a public sale, is · proper. First of all, it should be noted that the words 'shall' and 'may' appear frequently throughout the Act, and in close proximity to each other, so that it appears that the legislature was consciously using these words in the ordinary sense; that is, 'shall' as mandatory and 'may' as permissive. For instance the word 'shall' appears at least seven times in section 3 of chapter 247, and the word 'may' at least five times in the same section. If the legislature had intended the public sale to be mandatory, it would have substituted the word 'shall' for the word 'may' as the tenth word in the above quoted sentence so that said sentence would then read as follows:

" 'Any bonds, issued under the authority of this Act, shall be sold at public sale in such manner and at such time or times as may be determined by the governing body to be most advantageous.' This substitution would still have left to the city discretion as to the manner and times of sale.

 "Furthermore, it must be kept constantly in mind that chapter 247, like similar statutes in other states, is unique and confers upon municipalities a much greater degree of discretion than has been granted to them in the past by legislatures in the other areas of municipal activities. Finally, it must be remembered that these statutes for municipal promotion of industry are to be given a liberal interpretation in order to accomplish their broad social purposes. As said before in this ruling, when a municipality, with legislative permission, ventures into the field of industrial promotion expediency becomes the keynote. Generally when industrial bonds are issued a particular industry is in mind. The method of the sale of the bonds like the building to be constructed must be tailored to meet the needs of the particular industry. Many times these bonds will not attract the conservative investors who constitute the bulk of the buyers in the municipal bond field. The field of prospective buyers for industrial bonds very likely may be small thus greatly reducing the prospect that satisfactory bids will be received at a public sale, with the result that the bonds may become a burden on the

market. Sale of the bonds by private negotiation may in many instances result in the best price.

"It would appear that the purpose of this chapter can best be accomplished by construing paragraph 4 of section 7 as permitting, in the first instance, either the public or private sale of industrial revenue bonds."

We have omitted from the trial court's conclusions the statements rejecting each of plaintiff's contentions. We agree each is without merit.

We have given full consideration to every contention and proposition urged. Able presentations have been made on each side. It is our conclusion the judgment must be affirmed.— Affirmed.

All JUSTICES concur except HAYS, J., not sitting.