PRESENT:  Goodwyn, Mims, McClanahan, Powell, Kelsey and McCullough, JJ., and Millette, S.JJ.

WILLIAM BARR, ET AL.

v.  Record No. 170620

ATLANTIC COAST PIPELINE, LLC

OPINION BY
JUSTICE CLEO E. POWELL
July 5, 2018

FROM THE CIRCUIT COURT OF NELSON COUNTY
Michael T. Garrett, Judge

In this appeal, we consider whether Code § 56-49.01(A) allows a natural gas company to gain access to private property for the purpose of conducting surveys and other activities that are only necessary for the selection of the most advantageous route.  We further consider whether the trial court in this case misapplied Code § 56-49.01 and, if so, whether a natural gas company's subsequent entry onto the property to conduct activities authorized by the trial court results in an illegal taking of private property without compensation under Article I, § 11 of the Constitution of Virginia.

## I.  BACKGROUND

Atlantic Coast Pipeline, LLC ("ACP") is a limited liability company organized under the laws of the State of Delaware.  It was organized for the purpose of "operating as a natural gas company as defined by 15 U.S.C. § 717a."[1]  As such, ACP is subject to the jurisdiction of the Federal Energy Regulatory Commission ("FERC") under the Natural Gas Act, 15 U.S.C. § 717 *et seq.*

---

[1] 15 U.S.C. § 717a(6) defines "natural gas company" as "a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."

Presently, ACP is engaged in the regulatory approval process to build a natural gas pipeline that would extend from West Virginia, through the Commonwealth, to North Carolina. As part of this process, ACP sought to conduct surveys, tests, appraisals, and other examinations on the properties located along its proposed route. William Barr, Melissa Barr, Mary J. Hoffman, Nancy Holstein, Hazel H. Rhames, Trustee and Joseph L. Rhames, Trustee (collectively, the "landowners") own or are trustees for real properties along this proposed route.

On March 6, 2015, ACP mailed the landowners certified letters seeking permission to enter their properties to conduct preliminary surveys and other activities. When the landowners withheld their consent, ACP sent notices of intent to enter their properties pursuant to Code § 56-49.01. ACP then filed petitions for declaratory judgment against the landowners, seeking an order affirming ACP's authority to enter their properties "for the limited purposes defined in Va. Code § 56-49.01."

The landowners demurred, asserting that (1) the allegations in ACP's petition "fail to meet the pre-entry requirements of Va. Code § 56-49.01;" (2) the activities authorized by Code § 56-49.01 are "vague and overbroad" and constitute a taking of private property that cannot be authorized by the legislature because such a taking violates the Fifth Amendment of the United States Constitution and Article I, § 11 of the Constitution of Virginia; and (3) ACP is not a Virginia public service corporation and cannot exercise the power of eminent domain under Code § 56-49. After considering the parties' arguments, the trial court overruled the demurrers related to the landowners' constitutional arguments. In its ruling, the trial court explained that entry under Code § 56-49.01 was not an unconstitutional taking because the statute did not provide ACP with an unlimited right of entry with regard to date, scope or duration. The trial court further noted that activities ACP sought to perform were not for a private use, as the

2

transmission of natural gas serves a public purpose. *See* Code § 56-605; 15 U.S.C. 717(A).

However, the trial court found that ACP's notices of intent to enter were deficient under Code

§ 56-49.01(A) as they did not indicate the specific dates that ACP would enter the properties.

Therefore, the trial court sustained the landowners' demurrer without prejudice on that limited

basis.[2]

On May 31, 2016, ACP filed its amended petitions for declaratory judgment. In its

amended petitions, ACP acknowledged that it had not sent a new notice of intent to enter.

However, ACP alleged that a new notice of intent to enter would be sent prior to entry. As an

exhibit to its amended petitions, ACP included a template of its new notice.

The landowners again demurred, arguing that the amended petitions "fail to establish that

ACP is entitled to invoke the statutory powers for which it seeks entry of a declaratory order"

because ACP's amended petition did not allege that the activities were necessary to both satisfy

regulatory requirements and to select the most advantageous route. According to the

landowners, Code § 56-49.01 only permits entry to conduct activities for the purpose of

satisfying both purposes. Additionally, the landowners asserted that the amended petitions failed

to state an adequate claim for declaratory relief because, by only including a template of the new

notice of intent to enter, ACP was seeking an advisory opinion. The trial court overruled the

demurrers with regard to the statutory construction issue, but sustained the demurrers on the

basis that the amended petitions did not state an adequate claim for declaratory relief. In its

order sustaining the demurrer, the trial court granted ACP leave to file a second amended

petition.

---

[2] The trial court made no ruling on the landowners' third argument which related to Code
§ 56-49.

3

On December 6, 2016, ACP sent the landowners new notices of intent to enter. These notices indicated the various activities that ACP intended to perform and specified the date ranges that ACP intended to enter the properties to conduct these activities. The notices indicated that, due to the nature of the activities, two of them would take place approximately four months after the initial entry. ACP provided a specific date range that these activities would be carried out as well.

The following day, on December 7, 2016, ACP filed its second amended petition for declaratory judgment. The landowners demurred, again arguing that the amended petition failed to state a claim under Code § 56-49.01 because ACP only alleged that the activities were for the purpose of selecting the most advantageous route. Additionally, the landowners' asserted that the notices of intent to enter were statutorily deficient under Code § 56-49.01 because the notices provided a range of dates upon which entry would occur. The trial court overruled the demurrers. The landowners subsequently filed responsive pleadings to ACP's petitions and the case proceeded to trial.

At trial, ACP presented evidence that demonstrated its need to conduct activities in order to determine the most advantageous route for the pipeline. After ACP had presented its evidence, the landowners moved to strike, noting that Code § 56-49.01(A) permits activities that are necessary for two reasons: to both satisfy regulatory requirements and to select the most advantageous route. As these provisions are separated by the word "and," the landowners assert that these provisions must be read in the conjunctive. Therefore, according to the landowners, because ACP failed to present any evidence that the activities were necessary to satisfy any regulatory requirements, its petitions must fail. ACP argued that proper construction of the statute requires that the "and" separating the two provision be construed as disjunctive, not

conjunctive. After considering the parties' arguments, the trial court agreed with ACP, ruling that construing the operative language as disjunctive was the more logical reading of the statute. The trial court then granted ACP permission to enter the landowners' properties to conduct the necessary activities.

The landowners appeal.

## II. ANALYSIS

In their appeal, the landowners raise two issues. They first assert that the trial court erred in construing portions of Code § 56-49.01(A) in the disjunctive, because the statute is written in the conjunctive. They also argue that by relying on improper facts and allowing ACP to conduct activities that are outside of the scope of the statute, the trial court misapplied Code § 56-49.01. According to the landowners, as a result of the trial court's misapplication of the statute, ACP's entry onto their property was outside the scope of the statute and thus amounted to an illegal taking of private property without compensation, in violation of Article I, Section 11 of the Constitution of Virginia.

### A. Code § 56-49.01(A)

In their first assignment of error, the landowners take issue with the trial court's construction of Code § 56-49.01(A). Specifically, the landowners argue that the trial court erred by construing the "and" separating the provisions delineated by romanettes (i) and (ii) in the statute as disjunctive rather than conjunctive. The landowners insist that, the word "and," as used in this portion of the statute, must be read in the conjunctive. According to the landowners, the proper construction of the statute requires ACP to prove that its activities were necessary both "to satisfy any regulatory requirements" and "for the selection of the most advantageous

5

location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities" (collectively, "route selection"). We disagree.

"Issues of statutory construction are questions of law which we review de novo." *Commonwealth v. Amos*, 287 Va. 301, 305, 754 S.E.2d 304, 306 (2014). When interpreting a statute, our goal is to "'ascertain and give effect to the intention of the legislature,' which is usually self-evident from the statutory language." *Virginia Polytechnic Inst. & State Univ. v. Interactive Return Serv., Inc.*, 271 Va. 304, 309, 626 S.E.2d 436, 438 (2006) (quoting *Chase v. DaimlerChrysler Corp.*, 266 Va. 544, 547, 587 S.E.2d 521, 522 (2003)). Moreover, "whenever it is necessary to effectuate the obvious intention of the legislature, disjunctive words may be construed as conjunctive, and vice versa." *South East Public Service Corp. v. Commonwealth,* 165 Va. 116, 122, 181 S.E. 448, 450 (1935).[3]

---

[3] This same proposition has been recognized by several courts throughout the country. *United States v. Fisk*, 70 U.S. 445, 447 (1866) ("In the construction of statutes, it is the duty of the court to ascertain the clear intention of the legislature. In order to do this, courts are often compelled to construe 'or' as meaning 'and,' and again 'and' as meaning 'or.'"); *Marvel v. Merritt*, 116 U.S. 11, 12 (1885) (interpreting "and" as meaning either or both); *Peacock v. Lubbock Compress Co.*, 252 F.2d 892, 893 (5th Cir. 1958) ("But the word 'and' is not a word with a single meaning, for chameleonlike, it takes its color from its surroundings."); *Velazquez v. Countrywide Home Loans Servicing, L.P.*, 660 F.3d 893 (5th Cir. 2011) ("'One of the recognized uses of 'and' is to refer to 'either or both' of two alternatives.'" (quoting *Aerospatiale Helicopter Corp. v. Universal Health Servs. Inc.*, 778 S.W.2d 492, 502 (Tex. App. 1989))); *In re Det. of Altman*, 723 N.W.2d 181, 187 (Iowa 2006) ("[T]he conclusion that the legislature used the word 'and' in a conjunctive sense . . . . is not automatic. 'It is a well-known rule of statutory construction that courts will construe disjunctive words as conjunctive, and vice versa, and will disregard technical rules of grammar and punctuation, when necessary to arrive at the intent of the legislative body.'" (quoting *Green v. City of Mt. Pleasant*, 131 N.W.2d 5, 23 (Iowa 1964))); *Canale v. Steveson*, 458 S.W.2d 797, 800 (Tenn. 1970) ("Of course, the substitution of the disjunctive 'or' for conjunctive' and' is not a novel approach to the concept of statutory construction. [T]he inaccurate use of 'and' and 'or' tends to infect statutory elements; and . . . their meaning may be departed from and one read in place of the other in deference to the context."); *see also Slodov v. United States*, 436 U.S. 238, 246-47 (1978); *Doe v. Watson*, 49 U.S. 263, 272-73 (1850); *Reese Bros., Inc. v. United States*, 447 F.3d 229, 235 (3d Cir. 2006); *Person v. Miller*, 854 F.2d 656, 661 (4th Cir. 1988); *United States v. Goodwin*, 637 F.2d 250, 256 (4th Cir. 1981); *Trammell Crow Residential Co v. Am. Prot. Ins. Co.*, 574 Fed. Appx. 513,

Our analysis begins by noting that, the privilege to enter another's property for certain, limited purposes has its origins in the common law. *Palmer v. Atl. Coast Pipeline, LLC*, 293 Va. 573, 581, 801 S.E.2d 414, 418 (2017). Additionally, a duty or authority that has been imposed or created by the legislature also "carries with it the privilege to enter land in the possession of another for the purpose of performing or exercising such duty or authority in so far as the entry is reasonably necessary to such performance or exercise, if, but only if, all the requirements of the enactment are fulfilled." Restatement of Torts § 211. So long as the duty or authority to which the privilege is attached is conferred upon the actor, the status of the actor as a public official or private individual is immaterial. *Id.* at cmt. d.

Here, the requisite legislative authority is found in Code § 56-49.01(A), which states, in relevant part:

> Any firm, corporation, company, or partnership, organized for the bona fide purpose of operating as a natural gas company as defined in 15 U.S.C. § 717a, as amended, may make such examinations, tests, hand auger borings, appraisals, and surveys for its proposed line or location of its works as are necessary (i) to satisfy any regulatory requirements *and* (ii) for the selection of the most

521 (5th Cir. 2014); *Orr v. United States*, 486 F.2d 270, 276 (5th Cir. 1973); *Union Cent. L. Ins. Co. v. Skipper*, 115 F. 69, 72 (8th Cir. 1902); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1361-62 (Fed. Cir. 2008); *United States v. Mullendore*, 30 F. Supp. 13, 15 (N.D. Okla. 1939); *Medlin v. Crosby*, 583 So.2d 1290, 1295-96 (Ala. 1991) (quoting *In re Opinion of the Justices No. 93*, 41 So.2d 559, 563 (Ala. 1949)); *McNutt v. Los Angeles*, 201 P. 592, 595 (Cal. 1921); *Bania v. New Hartford*, 83 A.2d 165, 167 (Conn. 1951); *Clay v. Central R. & B. Co.*, 10 S.E. 967, 968-69 (Ga. 1889); *North Shore Post of American Legion v. Korzen*, 230 N.E.2d 833, 835 (Ill. 1967); *State v. Myers*, 44 N.E. 801, 801-02 (Ind. 1896); *State ex rel. Stephan v. Martin*, 641 P.2d 1011, 1016 (Kan. 1982); *Commonwealth v. Bartholomew*, 97 S.W.2d 591, 595 (Ky. App. Ct. 1936); *Heckathorn v. Heckathorn*, 280 N.W. 79, 81 (Mich. 1938); *Elliot Grocer Co. v. Field's Pure Food Market*, 281 N.W. 557, 558 (Mich. 1938); *People v. Harrison*, 160 N.W. 623, 625 (Mich. 1916); *Baker's Supermarkets, Inc. v. State*, 540 N.W.2d 574, 581 (Neb. 1995); *Carlsen v. State*, 254 N.W. 744, 747-48 (Neb. 1934); *State ex rel. Spillman v. Brictson Mfg. Co.*, 207 N.W. 664, 665 (Neb. 1926); *Murphy v. Zink*, 54 A.2d 250, 253 (N.J. 1947); *Colonial Mortg. Service Co. v. Southard*, 384 N.E.2d 250, 252 (Ohio 1978); *Scituate v. O'Rourke*, 239 A.2d 176, 182 (R.I. 1968); *State ex rel. Wisconsin Dry Milk Co. v. Circuit Court of Dodge Cty.*, 186 N.W. 732, 734 (Wis. 1922).

> advantageous location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities, and for such purposes, by its duly authorized officers, agents, or employees, may enter upon any property without the written permission of its owner if (a) the natural gas company has requested the owner's permission to inspect the property as provided in subsection B, (b) the owner's written permission is not received prior to the date entry is proposed, and (c) the natural gas company has given the owner notice of intent to enter as provided in subsection C.

(Emphasis added.)

Looking next to the legislative intent behind Code § 56-49.01(A), we find that it is obvious on the face of the statute: to grant natural gas companies access to private property for the purpose of conducting certain activities related to the possible construction of a natural gas pipeline. *See Palmer*, 293 Va. at 583, 801 S.E.2d at 419 (holding that Code § 56-49.01 provides "an entry-for-survey privilege" to natural gas companies applying for a FERC Certificate of Public Convenience and Necessity).[4]  Moreover, in *Palmer*, we explained that

> Code § 56-49.01 applies to "[a]ny" such "corporation" that fits within 15 U.S.C. § 717a's definition of a "natural gas company." That is, the corporation must be "engaged in the transportation of

---

[4] Our decision in *Palmer* did not limit the privilege of entry granted under Code § 56-49.01 to only those natural gas companies vested with federal eminent domain power.  Rather, our decision in *Palmer* merely held that the same privilege of entry recognized in the Restatement of Torts § 211 applies to natural gas companies under Code § 56-49.01. *Palmer*, 293 Va. at 583, 801 S.E.2d at 419.

Indeed, any contrary interpretation of *Palmer* is not supported by the facts of that case. Although a FERC certificate grants a natural gas company the power to exercise eminent domain authority pursuant to 15 USCS § 717f(h), the FERC certificate relevant in *Palmer* (as well as the present case) did not issue until October 13, 2017, approximately three months after our decision permitting ACP to enter the landowners' property was handed down. *See Atlantic Coast Pipeline, LLC*, 161 F.E.R.C. P61,042 (October 13, 2017).  As ACP was not vested with eminent domain authority through the issuance of a FERC certificate, our holding could not have been premised on the exercise of that federal eminent domain authority.  Rather it is clear that our holding was based entirely on the General Assembly's decision to specifically extend the privilege to natural gas companies under Code § 56-49.01, regardless of the prior issuance of a FERC certificate.

8

> natural gas in interstate commerce, or the sale in interstate
> commerce of such gas for resale."[5]

*Id.* at 578-79, 801 S.E.2d at 417.

As it is undisputed that ACP meets the definition of a natural gas company under 15 U.S.C. § 717a, the General Assembly has extended the privilege to enter land in the possession of another, provided that such entry falls within the scope of the authority granted by the legislature.

The scope of the authority granted by the legislature requires us to examine the activities that the statute permits natural gas companies conduct. Here, the determination of which activities to perform is left to the natural gas companies, as demonstrated by the fact that the inclusive list of activities is preceded by the auxiliary verb "may." *See Chesapeake & O. Ry. Co. v. Pulliam*, 185 Va. 908, 916, 41 S.E.2d 54, 58 (1947) ("The word 'may' is prima facie permissive, importing discretion."). However, this discretion is not unlimited. By the plain language of the statute, a natural gas company may only conduct those activities that "are necessary (i) to satisfy any regulatory requirements *and* (ii) for the selection of the most advantageous location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities." Code § 56-49.01(A).

The General Assembly's use of the present indicative verb "are" preceding the word "necessary" is telling. It indicates that the activities the natural gas company seeks to conduct must be presently necessary as opposed to necessary at some future time. Had the General Assembly intended to allow activities based on future necessity, it would have used the future indicative verb "will be."

---

[5] It is further worth noting that the definition of natural gas company under 15 U.S.C. § 717a does not include any requirement related to the issuance of a FERC certificate.

9

Viewed through this prism, it is apparent that the language at issue must be read in the disjunctive. If the "and" separating the enumerated provisions were read in the conjunctive, natural gas companies could only conduct those activities necessary to satisfy both provisions. Yet, it is clear that not all activities necessary to satisfy regulatory requirements are also necessary for the selection of the most advantageous route, etc., and vice versa. Moreover, as the landowners have correctly pointed out, the need to satisfy regulatory requirements occurs at an entirely different time from the need to select and/or improve the pipeline and its route.[6] Therefore, the few activities that are necessary to satisfy both provisions would not be necessary at the same time. Thus, by inextricably coupling the two enumerated provisions, any discretion granted to natural gas companies would be taken away for no discernible purpose.

We further note that reading this language in the conjunctive would render certain portions of the statute meaningless. For example, the second enumerated provision is comprised of four subparts which are written in the disjunctive. An activity may be deemed necessary under the second enumerated provision if that activity involves: (1) "the selection of the most advantageous location or route;" (2) "the improvement or straightening of [a] line or works;" (3) changing the location or construction of a pipeline; or (4) "providing additional facilities." Code § 56-49.01(A). Logically, the improvement or straightening of a pipeline would occur after the pipeline has been built, as would changing the location of the pipeline and, to some extent, the

_____

[6] Indeed, the parties are generally in agreement on this point. Further, we note that this position is supported by FERC's regulatory scheme for the issuance of a Certificate of Public Convenience and Necessity. *See generally* 18 C.F.R. § 157.6 (detailing the application process including what must be included in an application and requiring notice, including a map of the project, be provided to landowners whose property "[i]s directly affected (i.e., crossed or used)" by the proposed pipeline); 18 C.F.R. § 380.12 (identifying the mandatory regulatory reports that must be submitted as part of an application for a certificate); 18 C.F.R. § 157.8 (permitting a certificate to be issued prior to completion of the mandatory regulatory reports where the reports could not be completed because the landowner refused to allow access to the property).

construction of additional facilities. In other words, these activities would be conducted after, and independent of, the satisfaction of any regulatory requirements required to obtain the certificate. Thus, requiring that the activities of a natural gas company be necessary both for satisfying regulatory requirements and the several post-construction considerations would be completely unworkable. It is evident that the word "and" was used in this portion of the statute to indicate that a natural gas company may undertake activities necessary to address either of the enumerated provisions.[7]

We must also consider the nature of the enumerated provisions. The first enumerated provision is entirely objective, because an activity either is or is not necessary for the satisfaction of a regulatory requirement. The second enumerated provision, however, has a significant subjective component, which is eviscerated if mandatorily combined with the first enumerated provision. The second enumerated provision provides natural gas companies with access to conduct those activities that are "necessary . . . for the selection of the *most advantageous* location or route . . . ." Code § 56-49.01(A) (emphasis added). There is no set of universal factors that determine what makes one route or location more advantageous than another. Thus, the General Assembly has implicitly granted natural gas companies some discretion in determining which factors to weigh in selecting the most advantageous route. Similarly, there is no universal activity that would provide all of the necessary information to properly weigh each potential factor. Therefore, by granting natural gas companies the discretion to determine what

---

[7] Even if there were still regulatory requirements that needed to be satisfied after the construction of the pipeline, it is doubtful that a natural gas company would need to rely on Code § 56-49.01 at that point. Indeed, the statute would no longer be necessary, because any activities necessary for the satisfaction of regulatory requirements after the pipeline was built would likely be limited to the property to which the natural gas company already has access, i.e., the property occupied by the pipeline.

11

makes one route or location more advantageous than another, the General Assembly has also implicitly granted natural gas companies the discretion to choose which activities are necessary to make such a determination, which is not limited to minimal federal regulatory requirements.

Reading the "and" separating these provisions in the conjunctive effectively eliminates this discretion, as a natural gas company would only be permitted to conduct those activities that are necessary to satisfy both provisions. The factors that a natural gas company could weigh in selecting the most advantageous route or improving the existing route would be limited to only those factors that are also necessary to satisfy the regulatory requirements. Such a construction of the statute would effectively eliminate any differentiation in the two enumerated provisions.

While not dispositive, our determination on this issue is further supported by the unique nature of Code § 56-49.01(A). Specifically, we cannot overlook the fact that, within the first sentence of this statute, the General Assembly has unequivocally used the word "and" in both the conjunctive and the disjunctive. Where the General Assembly has intended to permit the exercise of some level of discretion in this statute, it uses the word "and" in the disjunctive. Most notably, the "and" used in conjunction with the activities that may be performed is obviously written in the disjunctive. To interpret this "and" in the conjunctive would mean that a natural gas company could not gain access to the property to conduct a simple survey without first establishing that it was necessary to also conduct other examinations, tests, hand auger borings and appraisals.

In contrast, where the General Assembly has intended to foreclose any exercise of discretion in this statute, it uses the word "and" in the conjunctive, such as in the mandatory prerequisites that a natural gas company must perform before it can enter the property without the landowners' permission. *Id.* (providing that employees of a natural gas company "may enter

12

upon any property without the written permission of its owner if (a) the natural gas company has requested the owner's permission to inspect the property, . . . (b) the owner's written permission is not received prior to the date entry is proposed, *and* (c) the natural gas company has given the owner notice of intent to enter") (emphasis added).  Only after all three steps have been completed successfully is entry permitted.  *See generally Chaffins v. Atlantic Coast Pipeline, LLC*, 293 Va. 564, 569, 801 S.E.2d 189, 191 (2017).

The fact that the proper application of the second enumerated factor involves the exercise of discretion by the natural gas company indicates, at least in the context of this statute, that the "and" must be construed as disjunctive, not conjunctive.

When the statute is considered in light of the underlying legislative intent, it is apparent that we must interpret the language at issue in the disjunctive.  Any other construction would be counterproductive to the legislature's clear intent.  Accordingly, the trial court did not err in its construction of Code § 56-49.01(A).

## B.  Unconstitutional Taking

The landowners next argue that the trial court failed to properly apply Code § 56-49.01 and, as a result, ACP's entry onto their properties amounts to an unconstitutional taking under Article I, § 11 of the Constitution of Virginia.  The landowners have explicitly stated that they are not challenging the facial constitutionality of the statute, *see* Oral Argument Audio at 9:56 to 10:07 (stating that they (the landowners) were "not here arguing today that [Code §] 56-49.01 is unconstitutional on its face"); rather, their argument is expressly limited to whether the trial court improperly applied the statute and whether such improper application would result in a violation of Article I, § 11 of the Constitution of Virginia.

13

In arguing that the trial court improperly applied Code § 56-49.01, the landowners assert that the trial court relied on improper facts in overruling their demurrers. Alternatively, the landowners claim that the trial court improperly allowed ACP to rely on the statute to conduct activities that were not permitted by Code § 56-49.01. Along these same lines, the landowners take issue with the duration of access to the properties that the trial court deemed permissible under the statute.

## 1. Improper Facts

Addressing first the landowners' claims that the trial court relied on improper facts in deciding the landowners' demurrer, we note that the argument they raise revolves around the differences between ACP's allegations in its initial petition and those it made in its subsequent petitions. We note, however, that the landowners have failed to provide any citation in the record where this issue was raised to the trial court. *See* Rules 5:17(c)(1) and 5:27(c) (requiring an exact reference to where the alleged error has been preserved for appeal). In their petition for appeal and their opening brief, the landowners cite only to their initial demurrer and the trial court's ruling on that demurrer. This issue was clearly not preserved at either of these locations, as there were no discrepancies between the petitions until ACP filed its amended petitions. Therefore, the issue could not have been raised to the trial court until after the amended petitions were filed.

Moreover, a review of the entire record fails to reveal any indication that this issue was ever brought to the attention of the trial court. Rule 5:25 states that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling." As it does not appear that this issue was ever brought to the trial court's attention, we hold it is not preserved for appeal.

14

## 2. Activities Beyond the Scope of Code § 56-49.01

The landowners next argue that the trial court permitted ACP to conduct activities that were not allowed by Code § 56-49.01. In making this argument, the landowners rely on a letter dated March 6, 2015, that ACP sent to the landowners and included in its petition as an attachment. The March 6, 2015 letter includes an outline of the survey process, which indicates that the process will include digging "test areas approximately 1.5 feet wide x 1.5 feet deep, every 50 feet or so along the proposed pipeline route;" collecting, cataloging and removal of "any items of cultural interest;" and clearing a path to see and walk. According to the landowners, "[t]hese activities bear no resemblance to the activities allowed by Code § 56-49.01."

The landowners' reliance on the March 6, 2015 letter is misplaced. Notably, the March 6, 2015 letter represented ACP's request for permission to enter the property. In other words, the March 6, 2015 letter was an attempt by ACP to get the landowners' permission to conduct these activities; it was not a statement of the activities that would be conducted if entry was granted under Code § 56-49.01. Therefore, our analysis is not concerned with any of the activities described in the March 6, 2015 letter.

Instead, we look to ACP's notice of intent to enter, dated December 6, 2016, which it sent after the landowners rejected its initial request for entry. The December 6, 2016 notice of intent to enter did not provide for "test areas approximately 1.5 feet wide x 1.5 feet deep, every 50 feet or so along the proposed pipeline route;" rather, ACP indicated that "small, shallow holes may be dug, which will be promptly refilled and repaired." We fail to find any meaningful distinction between the small, shallow holes that ACP sought to dig from "hand auger borings," which are expressly permitted under the statute. Similarly, the landowners fail to explain how clearing

15

brush as part of the surveying process is a violation of the statute, when the statute allows ACP

to conduct a survey. With regard to the disposition of any items of cultural significance that may

be found, we note that December 6, 2016 letter explicitly disavows ACP's previous position

providing for the removal of such items. Instead, the letter stated that items of cultural or

historical significance would be "immediately catalogued onsite and delivered" to the landowner.

It is unclear how merely cataloguing and delivering these items to the landowners could be

considered a constitutional violation. Certainly such actions could not be considered a taking, as

the artifacts are to be turned over to the landowners.[8] Thus, we cannot say that the trial court

permitted ACP to conduct any activities that were outside of the scope of Code § 56-49.01.

### 3. Use of Multiple Date Ranges Under Code § 56-49.01

We also find no merit in the landowners' final argument that Code § 56-49.01 did not

permit ACP to provide multiple date ranges for when it would conduct its activities. This Court

has already addressed this argument, albeit from a slightly different perspective. In *Chaffins*, we

addressed whether Code § 56-49.01 allowed a natural gas company to provide a notice of entry

without giving the exact date of when the survey would take pace. In rejecting such open-ended

notices, we explained that the notice requirements of Code § 56-49.01 provide an important

purpose: they "allow the landowner to be present during the tests if desired, arrange for livestock

to be confined prior to the entry, and ensure that any property damage is documented." 293 Va.

at 569, 801 S.E.2d at 191. Therefore,

> the requirement that a notice of intent to enter must "set forth the
> date of the intended entry" has an unmistakable meaning. The

---

[8] We further note that, in the event that a landowner's property is damaged as a result of these activities, the landowner is not without recourse. Code § 56-49.01(D) expressly provides that the natural gas company shall reimburse the landowners "for any actual damages resulting from such entry."

16

> notice must provide the landowner with *dates certain* upon which the natural gas company intends to enter the property.

*Id.* (emphasis added).

We further noted that focusing on the word "date," as the landowners do in the present case, "*could* suggest that a natural gas company only has a 24-hour period to complete its surveys and tests." *Id.* at 571 n.1, 801 S.E.2d at 192 n.1 (emphasis added). However, we went on to explain that such an interpretation is erroneous because, when the word "date" is read in context, it is clear that "Code § 56-49.01(C) only requires that a notice of intent to enter provide a limited range of dates as is necessary to complete the surveys and tests." *Id.*

Here, the December 6, 2016 notice of intent to enter explained that completion of the surveys and other activities would require multiple crews over several days. The notice provided a limited set of dates, the majority of which overlapped, when each crew would be present. As the landowners have not challenged these date ranges as being unreasonable, we cannot say that the date ranges provided by ACP's notice of intent to enter violated the statute.

Having determined that the trial court's application of Code § 56-49.01 was not improper in this case, we do not reach the question of whether the improper application of the statute could amount to an improper taking in violation of Article I, § 11 of the Constitution of Virginia.

### III. CONCLUSION

For the foregoing reasons, we will affirm the decision of the trial court.

*Affirmed.*

JUSTICE KELSEY, dissenting.

Virginia law authorizes natural gas companies, as defined by 15 U.S.C. § 717a(6), to enter onto private property for such surveys "as are *necessary* (i) to satisfy any regulatory

17

requirements *and* (ii) for the selection of the most advantageous location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities." Code § 56-49.01(A) (emphases added).

The first "necessary" precondition is that the company has to enter onto the private property to comply with legal requirements. The second "necessary" precondition is that the company wants to enter onto the private property to decide whether it will later take the property using the power of eminent domain. This conjunctive has-to/wants-to test delicately balances the rights of private property owners against the public's interest in efficient and reliable energy infrastructure.

Agreeing with Atlantic Coast Pipeline, LLC ("ACP"), the majority holds that "and" means "or" in Code § 56-49.01(A) and thus concludes that satisfying precondition (ii) renders it unnecessary to satisfy precondition (i). After making this emendation, the majority concludes: "As it is undisputed that ACP meets the definition of a natural gas company under 15 U.S.C. § 717a, the General Assembly has extended the privilege to enter land in the possession of another, provided that such entry falls within the scope of the authority granted by the legislature." *Ante* at 9. In plain speech, this statement means that it is sufficient that an out-of-state pipeline company *wants to* enter onto private property against a landowner's will (to determine whether to take the property) even though it does not *have to* do so in order to satisfy regulatory requirements. Under this view, it does not matter that the pipeline company has never been granted a federal permit to build the pipeline or even that the company has never applied for one. All that matters is that the pipeline company qualifies as a natural gas company under 15 U.S.C. § 717a(6) and wants to enter the private property to figure out whether to one day build a pipeline across it.

All of this reasoning, as well as its conclusion, collapses if "and" means "and." I think that it does. According to the plain meaning of the statute, ACP must satisfy both preconditions before it may lawfully conduct a physical survey on private property against a landowner's will. Because ACP could not prove at the time that the circuit court ruled that entering private property against the landowner's will was "*necessary . . . to satisfy any regulatory requirements*," Code § 56-49.01(A) (emphases added), I dissent from the majority's reasoning and result.[1]

## I.

As a general rule, one cannot unlawfully enter real property against a landowner's will. For centuries, the law has deemed such action a trespass and has subjected the trespasser to civil, and sometimes criminal, liability. Anglo-American law has an unbroken record of treating private property ownership as a fundamental right, one that serves as a pillar upon which many, if not most, other rights depend. "This view presupposes that an essential 'interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other.'" *AGCS Marine Ins. v. Arlington Cty.*, 293 Va. 469, 476, 800 S.E.2d 159, 163 (2017) (quoting *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 552 (1972)). The Virginia Constitution reaffirms this ancient belief. *See* Va. Const. art. I, § 1 (listing "the means

---

[1] This case arose in 2015 when several landowners refused to grant ACP permission to enter onto their properties to conduct surveys. At that time, ACP had not received the required Certificate of Public Convenience and Necessity ("certificate") from the Federal Energy Regulatory Commission ("FERC") authorizing the construction of the pipeline. ACP filed a declaratory judgment action against the landowners seeking a judicial declaration of its right to survey their properties prior to obtaining the FERC certificate. In its final order, the circuit court held that Code § 56-49.01(A) authorized ACP's pre-certificate surveys. ACP thereafter entered the landowners' properties to conduct surveys. The landowners appealed, arguing that the pre-certificate surveys violated Code § 56-49.01(A). In October 2017, after we granted the landowners an appeal to consider this case, FERC issued ACP a certificate. No party has suggested that the post-judgment FERC certificate has mooted any issue on appeal.

of acquiring and possessing property" as an "inherent" right); *id.* § 11 (declaring "private property" to be a "fundamental" right); *see also* Code § 1-219.1(A) (same).

One of the core features of private property rights at common law was the right to keep property *private* — which necessarily embraces the right to exclude the *public*. As Blackstone explained, private property is "that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe." 2 William Blackstone, Commentaries *2. James Madison similarly saw the power of "exclusion of every other individual" as the core feature of the right to private property. James Madison, *Property*, Nat'l Gazette, Mar. 29, 1792, *reprinted in* 1 The Founders' Constitution 598, 598 (Philip B. Kurland & Ralph Lerner eds., 1987).

We recently expressed our unanimous agreement with this view, reaffirming that, in Virginia, "the right to exclude others is generally 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Palmer v. Atlantic Coast Pipeline, LLC*, 293 Va. 573, 581, 801 S.E.2d 414, 418 (2017) (alteration omitted) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984)); *see also Byrd v. United States*, 584 U.S. ___, ___, 138 S. Ct. 1518, 1527 (2018) ("One of the main rights attaching to property is the right to exclude others . . . ." (citation omitted)); *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999); *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 179-80 & n.11 (1979).

Because of its jealous protection of private property rights, the common law recognized only a limited number of exceptions to the right to exclude. The first Restatement of Torts lists many of these common-law privileges. *See Palmer*, 293 Va. at 581-82, 801 S.E.2d at 418 (citing Restatement of Torts §§ 191-211 (1934)). The most potent exception is the sovereign right of

the government to subordinate private property ownership to the greater needs of the public. Our law, however, has only recognized two ways for the government to exercise this power of subordination. The first is the power of eminent domain. The second is the police power.[2]

The power of eminent domain is qualified by the duty to pay just compensation to the property owner. *See* U.S. Const. amend. V; Va. Const. art. I, § 11; Code § 1-219.1(A).[3] When exercised properly, the police power contains no such qualification.[4] In part, for that very reason, the permissible scope of the police power has its limits. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992) ("If . . . the uses of private property were subject to unbridled, uncompensated qualification under the police power, 'the natural tendency of human nature would be to extend the qualification more and more until at last private property disappeared.'" (alteration and citation omitted)).[5]

_____

[2] Though similar, "the foundations of the police power and the power of eminent domain" rest on different footings. *Mumpower v. Housing Auth.*, 176 Va. 426, 435-36, 11 S.E.2d 732, 734-35 (1940). "The line between eminent domain and the police power is a hard one to hold with constancy and consistency, and it is not surprising that now and again these two great powers of government have been confused." *Id.* at 435-36, 11 S.E.2d at 735 (citation omitted). "Such confusion will be avoided . . . by considering each separately; however, the similarity of reason and purpose will be apparent." *Id.* at 436, 11 S.E.2d at 735.

[3] The landowners in this case do not argue on appeal that Code § 56-49.01 on its face fails to provide a just-compensation remedy for damage to their intangible right to exclude, albeit temporarily, the pipeline surveyors from their property. *See* Oral Argument Audio at 11:28 to 13:14. The majority does not address this issue. Neither do I.

[4] *See, e.g.*, *State Highway & Transp. Comm'r v. Lanier Farm, Inc.*, 233 Va. 506, 510, 357 S.E.2d 531, 533 (1987); *Commonwealth ex rel. State Water Control Bd. v. County Utils. Corp.*, 223 Va. 534, 542, 290 S.E.2d 867, 872 (1982); *Weber City Sanitation Comm'n v. Craft*, 196 Va. 1140, 1148, 87 S.E.2d 153, 158 (1955); *Kornegay v. City of Richmond*, 185 Va. 1013, 1030, 41 S.E.2d 45, 53 (1947); *West Bros. Brick v. City of Alexandria*, 169 Va. 271, 287, 192 S.E. 881, 888, *appeal dismissed*, 302 U.S. 658 (1937) (per curiam); *Richmond, Fredericksburg & Potomac R.R. v. City of Richmond*, 67 Va. (26 Gratt.) 83, 102-04 (1875), *aff'd sub nom. Railroad v. Richmond*, 96 U.S. 521 (1878).

[5] *See also Panhandle E. Pipe Line Co. v. State Highway Comm'n*, 294 U.S. 613, 622 (1935) ("The police power of a State, while not susceptible of definition with circumstantial precision, must be exercised within a limited ambit . . . . Under it there is no unrestricted

21

So too does the power of eminent domain have its own unique limitations.  One of which

is that

> when the legislature has prescribed the conditions and established
> regulations for the exercise of the right [of eminent domain], the
> performance of the conditions and the observance of the
> regulations become an indispensable condition precedent to the
> exercise of the right, and any failure to comply with the
> requirements of the statute, will invalidate the confiscation of
> property.

Christopher G. Tiedeman, A Treatise on the Limitations of Police Power in the United States 377

(1886); *see, e.g.*, *Charles v. Big Sandy & Cumberland R.R.*, 142 Va. 512, 516-18, 129 S.E. 384,

385 (1925).[6]

## II.

## A.

In this case, a private company wants to build an interstate pipeline across private

property and, quite prudently, desires to survey the property along the proposed route before

---

authority to accomplish whatever the public may presently desire.  It is the governmental power
of self protection, and permits reasonable regulation of rights and property in particulars essential
to the preservation of the community from injury."); *Nashville, Chattanooga & St. Louis Ry. v.
Walters*, 294 U.S. 405, 415 & n.7 (1935) ("The police power . . . may not be exerted arbitrarily
or unreasonably."); *Chicago, Burlington & Quincy Ry. v. Illinois*, 200 U.S. 561, 594 (1906)
("There are, unquestionably, limitations upon the exercise of the police power which cannot,
under any circumstances, be ignored."); *Craft*, 196 Va. at 1147, 87 S.E.2d at 158 (stating that an
exercise of the police power is valid "so long as unreasonable methods are not employed, nor the
natural and constitutional rights of citizens invaded"); *Mumpower*, 176 Va. at 443-44, 11 S.E.2d
at 738 (stating that an exercise of the police power cannot be "clearly arbitrary and
unreasonable" (citations omitted)); *Gorieb v. Fox*, 145 Va. 554, 561, 134 S.E. 914, 916 (1926)
(stating that the police power "must never be exercised except in a reasonable manner and for the
welfare of the public"), *aff'd*, 274 U.S. 603 (1927).

[6] *See also* Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest
upon the Legislative Power of the States of the American Union 528-29 (1868); 3 John F. Dillon,
Commentaries on the Law of Municipal Corporations §§ 1040-41, at 1646-48 (5th rev. ed.
1911); Alfred D. Jahr, Law of Eminent Domain: Valuation and Procedure §§ 190, 194-200, at
308-09, 311-20 (1953).

doing so. As it has in other contexts, the General Assembly has vested the pipeline company with the sovereign's power to override the landowner's common-law right to exclude the public, thereby converting the company from a trespasser into a lawful licensee. The fact that the license comes from the legislature rather than the landowner is of no consequence, of course, so long as the company has not exceeded its delegated sovereign authority.

In Code § 56-49.01(A), the General Assembly did not purport to delegate its inherent police power to ACP, and ACP does not claim to be acting pursuant to such delegated authority. Instead, the legislature predicated the entire enterprise on the premise that the pipeline company's entry onto private property — both for purposes of surveys and later construction — would be constitutionally justified by the power of eminent domain. This premise explains why Code § 56-49.01(D) provides for recovery of "actual damages" resulting from the survey entry, a remedy wholly unnecessary in the police-power context where compensation is unavailable, *see supra* at 21 & note 4.

We recently addressed these issues in *Palmer*. We observed that "every state has codified the common law privilege of a body *exercising eminent domain authority* to enter private property to conduct preliminary surveys without trespass liability. Virginia statutory law has done so for 235 years." *Palmer*, 293 Va. at 582, 801 S.E.2d at 418-19 (emphasis added) (footnote omitted). In our survey of Virginia law, we emphasized: "*Most relevant to the present case*, the Code of 1904 granted entry-for-survey authority to 'any company' vested with *eminent domain authority*." *Id.* at 583, 801 S.E.2d at 419 (emphases added) (alteration and citation omitted).

We also took note of the current Virginia eminent-domain statute that extends the same entry-for-survey "privilege to 'any petitioner *exercising*' *the power of eminent domain*." *Id.*

23

(emphasis added) (quoting Code § 25.1-203(A)).  The Restatement of Torts, which we relied

upon in *Palmer*, confirms this interpretation.  It classifies the common-law privilege to enter

another's land for survey purposes as an "entry pursuant to legislative duty or authority" and

states that, if a "legislative enactment" creates a "duty or authority" to enter another's land, an

actor is privileged to enter that land "in so far as the entry is reasonably necessary" to perform

such duty or to exercise such authority "if, but only if, all the requirements of the enactment are

fulfilled."  Restatement of Torts § 211, at 529 (emphasis and capitalization omitted).

In other words, "[i]n order that the actor may avail himself of the statutory privilege, it is

necessary that all the provisions of the statute . . . by way of condition precedent to entry on his

part, shall have been complied with."  *Id.* cmt. j, at 532-33.

> Thus, if *any one of the requirements* imposed by the enactment is
> not fulfilled, although the accomplishment of the purpose of the
> enactment may not thereby be invalidated, the actor is subject to
> liability to the possessor for his entry and for all harm resulting . . .
> and the actor's privilege to continue on the land to complete the
> accomplishment of his purpose ceases.

*Id.* cmt. i, at 532 (emphasis added).  This language also appears in the second Restatement.  *See*

Restatement (Second) of Torts § 211 & cmts. i-j, at 398, 400-01 (1965).

Our unanimous opinion in *Palmer* predicated the statutory entry-for-survey privilege on

the pipeline company being vested with eminent domain authority.  Though the source of that

power was debated in *Palmer*,[7] we never resolved the issue.  In the present case, however, both

the majority and I agree that the only source of that power is the Natural Gas Act, 15 U.S.C.

§§ 717-717z, which provides FERC with exclusive power to regulate the transportation of

---

[7] In *Palmer*, ACP's petition for declaratory judgment asserted that it was "vested with the power of eminent domain" under the general statutes governing public service corporations.  *See* Petition for Declaratory Judgment at 1-2, para. 3, *Palmer*, 293 Va. 573, 801 S.E.2d 414 (Record No. 160630) (citing Code § 56-49(2)).

natural gas in interstate commerce and grants to natural gas companies, as defined in 15 U.S.C.

§ 717a(6), the power of eminent domain only *after* FERC issues a certificate, *see* 15 U.S.C.

§ 717f(h). *See generally East Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 818 (4th Cir. 2004).

This eminent-domain rationale finds its textual expression in Code § 56-49.01(A).

B.

The majority sidelines the analytical basis for *Palmer* with the observation that, at the

time we issued our opinion, ACP had not yet received its FERC certificate. *See ante* at 8 note 4.

FERC issued a certificate to ACP in October 2017, three months after our opinion in *Palmer*.

Therefore, according to the majority, we could not have meant what we said about the eminent-

domain rationale underlying Code § 56-49.01(A) because "ACP was not vested with eminent

domain authority" at the time of our decision and thus "our holding could not have been

premised on the exercise of that federal eminent domain authority." *Ante* at 8 note 4. This

reasoning fails for at least two reasons.

First, like the present case, *Palmer* was an appeal of a declaratory judgment action. Both

our Court and the circuit court were asked to declare the future rights of the parties based upon

the present law. *See generally Cherrie v. Virginia Health Servs., Inc.*, 292 Va. 309, 317-18 &

n.2, 787 S.E.2d 855, 859 & n.2 (2016) (recognizing that a declaratory judgment proceeding is

intended "to permit the declaration of . . . rights before they mature" (citation omitted)). We did

just that by predicating ACP's right of entry under Code § 56-49.01(A) on it being vested with

the power to exercise "eminent domain authority." *See Palmer*, 293 Va. at 581-83, 801 S.E.2d at

418-19. "*Most relevant to the present case*," we said, an earlier Code provision similarly

"granted entry-for-survey authority to 'any company' vested with eminent domain authority."

*Id.* at 583, 801 S.E.2d at 419 (emphasis added) (alteration and citation omitted). Our analysis

25

focused on this "[m]ost relevant" point, *id.*, because we were answering the legal question not under past circumstances only, but also under circumstances that would arise in the foreseeable future as well — including those arising three months later when ACP ultimately obtained a FERC certificate.

Second, the majority states that "it is clear that our holding was based entirely on the General Assembly's decision to specifically extend the privilege to natural gas companies under Code § 56-49.01, regardless of the prior issuance of a FERC certificate." *Ante* at 8 note 4. This statement exposes the conceptual error at the heart of the majority's analysis — not because the statement is wrong, but rather misunderstood. Our holding in *Palmer* was of course "based entirely on . . . Code § 56-49.01," *ante* at 8 note 4. So is my dissent in this case. The question then and now is how to interpret Code § 56-49.01.

*Palmer* observed that statutory rights of entry have traditionally been granted to entities "*vested* with eminent domain authority," *Palmer*, 293 Va. at 583, 801 S.E.2d at 419 (emphasis added), not only to entities actually "*exercis*[*ing*] . . . that federal eminent domain authority," *ante* at 8 note 4 (emphasis added), at the time of the nonconsensual entry. This traditional view explains precondition (i) in Code § 56-49.01(A) and shows how excising it from the statute — by interpreting "and" to mean "or" — erroneously leaves precondition (ii) as the only remaining, rather feeble, check on the power of a pipeline company to enter private property against a landowner's will.

III.

Given this background, I cannot accept the majority's assertion that "and" means "or" in Code § 56-49.01(A). Again, this provision includes two preconditions: that the survey is "*necessary* (i) to satisfy any regulatory requirements *and* (ii) for the selection of the most

26

advantageous location or route, the improvement or straightening of its line or works, changes of location or construction, or providing additional facilities." Code § 56-49.01(A) (emphases added).

A.

With respect to the first precondition — romanette (i) — no FERC "regulatory requirements" make it "necessary," *id.*, for a pipeline company, prior to obtaining a certificate, to perform physical surveys of private property against a landowner's will. To the contrary, the FERC regulations assume that some landowners may not consent to the surveys but nonetheless permit the certificate application process to go forward without interruption. *See* 18 C.F.R. §§ 157.8(a)(1); *id.* § 380.12(a)(2); *id.* § 380.12(f)(2)(ii); *id.* § 385.2013.[8]

Once FERC issues a certificate, however, the pipeline company must complete all required surveys within the time prescribed by the order granting the certificate or before construction. *See* 18 C.F.R. § 157.5(a) (requiring applications to contain all information necessary to advise FERC fully concerning the project); *id.* § 380.12(f)(1)(ii), (f)(2) (requiring survey reports to be included in the environmental report regarding cultural resources attached to the initial application); *id.* § 380.12(f)(2)(ii) (requiring surveys to be conducted "after access is granted" if landowners do not consent and allowing the reports to be "filed after a certificate is

---

[8] *See generally* Office of Energy Projects, Fed. Energy Regulatory Comm'n, Guidelines for Reporting on Cultural Resources Investigations for Natural Gas Projects 3, 16, 19 (July 2017), https://www.ferc.gov/industries/gas/enviro/guidelines/cultural-guidelines-final.pdf (confirming that a pipeline company may identify unsurveyed lands when landowners deny access and that a pipeline company "do[es] not receive eminent domain authority . . . *until after a FERC Certificate . . . is issued*" (emphasis in original)); 1 Office of Energy Projects, Fed. Energy Regulatory Comm'n, Guidance Manual for Environmental Report Preparation for Applications Filed Under the Natural Gas Act 1-4, 4-43, 4-51 & n.24, 4-68, 4-71 to -72, 4-75, Attachment 1-22 (Feb. 2017), https://www.ferc.gov/industries/gas/enviro/guidelines/guidance-manual-volume-1.pdf (describing alternatives when landowners deny access).

issued"); *id.* § 380.12(f)(5) (requiring all cultural resource reports and plans to be approved before construction).

In cases where landowners have denied a pipeline company survey access, a host of FERC administrative rulings have consistently granted the company a certificate conditioned upon the completion of all surveys once the company gains access through the power of eminent domain, often including conditions requiring the completion of revised surveys, remaining required surveys, and new surveys after construction.[9] These FERC administrative rulings, fully consistent with FERC regulations, confirm that surveys do not constitute a regulatory requirement until *after* FERC issues a certificate and thereby grants the pipeline company the power of eminent domain.

In fact, in several instances, the survey requirements do not come directly from the FERC regulations themselves but instead from other federal and state entities through a consultative process that the FERC regulations impose.[10] These entities, in turn, impose survey requirements

---

[9] *See infra* Appendix at 41.

[10] *See* 18 C.F.R. §§ 157.201-.218 (allowing a pipeline company that has already obtained an original certificate to apply for a "blanket certificate" authorizing it to acquire, operate, replace, or rearrange its facilities either automatically or with notice to FERC); *id.* § 157.208(c)(9) (requiring a blanket-certificate holder to include consultation results in a request to perform certain activities); *id.* § 157 app. I (requiring a blanket-certificate holder to engage in informal consultations with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service); *id.* § 157 app. II (requiring a blanket-certificate holder to consult with the State Historic Preservation Officer or Tribal Historic Preservation Officer to, among other things, "determine the need for surveys"); *id.* § 380.3(b)(2)-(3) (requiring an applicant to "[c]onduct any studies that the Commission staff considers necessary or relevant to determine the impact of the proposal on the human environment and natural resources" and to "[c]onsult with appropriate Federal, regional, State, and local agencies during the planning stages of the proposed action to ensure that all potential environmental impacts are identified"); *id.* § 380.12(e)-(f) (requiring an applicant to submit the results of required consultations with the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, the State Historic Preservation Officer, the Tribal Historical Preservation Officer, or "land-management agencies" as part of its application); *id.* § 380.13 (requiring consultation with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service pursuant to the Endangered Species Act); *id.* § 380.14(a)(3) (requiring project

28

that the FERC regulations require the pipeline company to follow.[11] The only specific "surveys" directly required by the regulations governing applications are survey drawings of facilities and noise surveys.[12] Therefore, there is no regulatory requirement of any kind to conduct a survey until *after* FERC has issued a certificate, at which point the regulations require the pipeline company to supplement its application with previously uncompleted surveys. As ACP conceded at oral argument, there is "no C.F.R. provision" requiring a pre-certificate survey against a landowner's will. *See* Oral Argument Audio at 26:57 to 28:32.

In the context of Code § 56-49.01(A), the first precondition to the right of entry — that the entry be "necessary (i) to satisfy any regulatory requirements" — fits securely within the constitutional justification for the statute that we explored at length in *Palmer*. The FERC regulations encourage on-site surveys prior to obtaining a certificate so long as the landowner consents. *See* Revision of Existing Regulations Under Part 157 and Related Sections of the Commission's Regulations Under the Natural Gas Act, 88 FERC P61,297, 1999 FERC LEXIS 2056, at *74-76, *84-85 (1999) ("[W]e understand that if access to the property is denied by the landowner, comments for the areas to which access has been denied would be filed after the certificate is issued. The Commission will determine on a case-by-case basis if it is necessary to issue a certificate contingent on the pipeline receiving clearances before construction begins.").[13]

---

sponsor to consult with the State Historic Preservation Officer and Tribal Historic Preservation Officer); *id.* § 380 app. A (including consultation results as part of minimum filing requirements for application).

[11] *See id.* § 157 app. I § 4(a); *id.* § 157 app. II §§ (3)-(6), (9); *id.* § 380.3(b)(2); *id.* § 380.12(e)(4)-(5), (f)(1)-(2); *id.* § 380.13(b)(5); *id.* § 380.14(a)(2); *id.* § 380 app. A.

[12] *See id.* § 157.206(b)(5)(ii); *id.* § 380.12(j)(5), (k)(2)(ii).

[13] *See also id.* § 157.8(a)(1) (stating that no application will be rejected "solely on the basis of . . . [e]nvironmental reports that are incomplete because the company has not been granted access by the affected landowner(s) to perform required surveys"); *id.* § 380.12(a)(2) (stating that if a resource report is required as part of the application but is not included, "the

29

In short, the regulatory requirement to conduct surveys of private property owned by a nonconsenting landowner arises only after FERC issues its certificate authorizing a pipeline company to employ the power of eminent domain. Code § 56-49.01(A) grants a pipeline company the power to supersede a landowner's will only after the company has received a certificate because only then does the Natural Gas Act vest the company with the power of eminent domain, *see* 15 U.S.C. § 717f(h). The pipeline company's nonconsensual survey is a statutory precursor to the actual exercise of that power.

The word "and" between preconditions (i) and (ii) of Code § 56-49.01(A) means exactly what it says. Its plain meaning squares the text of the statute with the constitutional justification for it under the power of eminent domain that we explained in *Palmer*. Reading the statute to wholly dispense with precondition (i) undermines the constitutional legitimacy of the statutory scheme. Doing so allows a pipeline company without a FERC certificate (even a pipeline company that has not even applied for a certificate) to enter private property against a landowner's will. In this respect, the majority's reasoning has no limiting principle. Any natural gas company, as defined by 15 U.S.C. § 717a(6), apparently now has a legal right to overrule a landowner's common-law right to exclude trespassers so long as the company thinks that doing so might help it decide whether, and if so, where, to build a future pipeline. Given the jealous

---

environmental report shall explain why it is missing and when the applicant anticipates it will be filed"); *id.* § 380.12(f)(1)-(2) (requiring survey reports to be included in the environmental report regarding cultural resources attached to the initial application); *id.* § 380.12(f)(2)(ii) (requiring surveys to be conducted "after access is granted" if landowners do not consent and allowing the reports to be "filed after a certificate is issued"); *id.* § 385.2013 (requiring other agencies to notify FERC of their approval processes regarding the project, including additional information necessary for that agency to evaluate a request for approval or authorization, the time that the agency will allow the applicant to provide the additional information, and any "studies" that will be necessary for the agency to make its decision).

protection that our law has traditionally afforded property rights, I cannot presume that the

General Assembly intended that we transpose "or" in place of "and" to reach this result.

B.

In support of its disjunctive interpretation, the majority relies primarily on a single

Virginia case, *South East Public Service Corp. of Virginia v. Commonwealth*, 165 Va. 116, 181

S.E. 448 (1935). *See ante* at 6. In that case, while we recognized that there are instances in

which "or" can mean "and," we actually held that "or" in a statute meant "or," not "and,"

because, like most readers of English, "[w]e naturally assume[d] . . . that the draftsman intended

the word 'or' to have its ordinary, literal and disjunctive meaning." *South E. Pub. Serv. Corp.*,

165 Va. at 122, 181 S.E. at 450.[14]

The same is true with the word "and." We naturally assume that "[t]he use of the word

'and' . . . points to the conclusion that it was the intention of the legislature that 'and' should

have its ordinary, literal conjunctive meaning." *Safeway Stores, Inc. v. Milk Comm'n*, 197 Va.

69, 74, 87 S.E.2d 769, 772 (1955). *See generally* Antonin Scalia & Bryan A. Garner, Reading

Law: The Interpretation of Legal Texts 116 (2012) ("The conjunctions *and* and *or* are two of the

---

[14] *See also Encino Motorcars, LLC v. Navarro*, 584 U.S. ___, ___, 138 S. Ct. 1134, 1140-42 (2018) (rejecting the application of the "distributive canon" in favor of the ordinary, disjunctive meaning of the word "or," noting that "'or' is 'almost always disjunctive'" (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013))); *Patterson v. Commonwealth*, 216 Va. 306, 307, 218 S.E.2d 435, 436 (1975) (per curiam) ("The language 'make or draw or utter or deliver' is in the disjunctive and there is nothing in the statute to indicate that 'or' should be read to mean 'and.' Thus, 'or' is to be given its ordinary meaning."); *Williams v. Commonwealth*, 61 Va. App. 1, 12, 733 S.E.2d 124, 129 (2012) ("We conclude the legislature intended that 'or' should have its ordinary meaning, and we therefore may not construe this disjunctive term as the conjunctive 'and.'"). *See generally* 1A Norman J. Singer & J.D. Shambie Singer, Sutherland's Statutes & Statutory Construction § 21:14, at 177-93 (7th ed. 2009 & Supp. 2017-2018) (stating the general rule and maintaining that the words "and" and "or" are not "interchangeable" despite their misuse and that "[t]he literal meaning of these terms should be followed unless it renders the statute inoperable or the meaning becomes questionable").

elemental words in the English language. Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives." (emphases in original)).

It is often said that "[i]n legal codes, as in ordinary conversation, 'a word is known by the company it keeps.'" *Tvardek v. Powhatan Vill. Homeowners Ass'n, Inc.*, 291 Va. 269, 278, 784 S.E.2d 280, 285 (2016) (citation omitted). That statement is particularly true with the word "and." Suppose a statute stated that a police officer may trespass onto private property if it is *necessary* (i) to chase in hot pursuit a violent felon *and* (ii) the officer deems it reasonable to do so under the circumstances. I would be shocked if the officer interpreted the statute to authorize him to chase a high-school truant into a neighbor's home solely because he, the officer, personally thought it was reasonable to do so. The *necessary* predicate qualifying both preconditions amplifies the natural understanding of "and" to truly mean "and."

I acknowledge the majority's footnote 3, listing 37 out-of-state cases recognizing that "and" can mean "or" and vice versa. *See ante* at 6 note 3. No doubt that is sometimes true. *See generally* Scalia & Garner, *supra*, at 116-25 (describing certain "nuances" to the general conjunctive/disjunctive canon that stem from "negatives, plurals, and various specific wordings" (emphases omitted)). But this transposition is still an exception to the general rule. There are likely thousands of cases in which courts interpret "and" to mean "and" without explaining why. The linguistic default is that "and" is conjunctive and "or" is disjunctive. It is only the anomalous cases in which courts transpose these words that require an explanation.

A review of these 37 cases will show that not one of them has an explanation applicable to our case. Not one interprets a statutory text like Code § 56-49.01(A) that imposes preconditions on a legal license authorizing an action (such as a trespass) that, absent the license, would otherwise be unlawful. Thus, none of these cases refute the view that the gravity of

granting such a license counsels a cautious, not expansive, reading of the statute. Nor do these cases involve statutory texts like Code § 56-49.01(A) that include items in a conjunctive list, separated by romanettes, and introduced as "necessary" preconditions. A list of "necessary" prerequisites connotes a collective *necessity*, not a smorgasbord of options from which one can pick and choose.

Perhaps most important, not one of these 37 cases was decided by a Virginia court. And our own precedent provides sufficient clarity on this issue. As noted earlier, *see supra* at 31, in *South East Public Service Corp.* we recognized that there may be anomalous textual circumstances where "and" can legitimately mean "or." *See* 165 Va. at 122, 181 S.E. at 450. But we emphasized that a judicial transposition of "and" to "or" should only occur "[w]hen, and *only when*, necessary to effectuate *the obvious intention* of the legislature." *Id.* (emphases added) (citation omitted). The only time that we ever find such a textual anomaly to exist — making it obvious that "and" should mean "or" — is when "the legislative intent would be *completely aborted* if the conjunctive words in th[e] statute are not construed as disjunctive." *Industrial Dev. Auth. v. La France Cleaners & Laundry Corp.*, 216 Va. 277, 281, 217 S.E.2d 879, 882 (1975) (emphasis added). The majority offers four cascading arguments as to why that circumstance exists here. I find none of them persuasive.

1.

The majority begins with the assertion that "the legislative intent behind Code § 56-49.01(A) . . . is obvious on the face of the statute: to grant natural gas companies access to private property for the purpose of conducting certain activities related to the possible construction of a natural gas pipeline." *Ante* at 8. That may be the general idea, but the question that we must answer is more specific: Did the legislature intend to confer on a pipeline company

33

the power to enter private property against a landowner's will *before* FERC grants the company

the power of eminent domain?  The majority answers this question with several brief

observations:

> If the "and" separating the enumerated provisions were read in the
> conjunctive, natural gas companies could only conduct those
> activities necessary to satisfy both provisions.  Yet, it is clear that
> not all activities necessary to satisfy regulatory requirements are
> also necessary for the selection of the most advantageous route,
> etc., and vice versa.

*Ante* at 10.  This logic does not follow.  It assumes that the General Assembly cannot require

both preconditions (i) and (ii) because each of those subsections may demand something that the

other does not.  Perhaps so.  But what difference does that make?  Would we not expect that

stating preconditions (i) and (ii) separately would emphasize their separate requirements?[15]

Not in this case, the majority answers, because "the *need* to satisfy regulatory

requirements occurs at an entirely different time from the *need* to select and/or improve the

pipeline and its route."  *Ante* at 10 (emphases added).  This ambiguous assertion contributes little

to the argument.  The "select and/or improve" timeline, *ante* at 10, spans an indeterminate period

before and after the issuance of a FERC certificate.  The only question that we should be asking

---

[15] The use of separately enumerated subdivisions in a statute, like romanettes (i) and (ii) in Code § 56-49.01(A), in addition to the conjunction "and" further supports the conclusion that the subdivisions are conjunctive.  *See Coan v. State Farm Mut. Auto. Ins.*, 911 F. Supp. 81, 85 (E.D.N.Y. 1996) ("Moreover, these provisions are contained in a single sentence broken down into three subdivisions and stated in the conjunctive, as demonstrated by use of the word 'and' connecting the second and third subdivisions.  This conjunctive structure indicates that all three prongs must be applied . . . ."); *Stanley Jacobs Prod., LTD. v. 9472541 Can. Inc.*, No. 15-12186 (KG) (Jointly Administered), Adv. Pro. No. 17-50476 (KG), 2018 Bankr. LEXIS 464, at *20-21 (Bankr. D. Del. Feb. 21, 2018) (unpublished) ("Rule 6006(f)'s conjunctive structure requires a party to satisfy all six requirements.").  Of the 37 cases cited by the majority in its footnote 3, only 2 involve items in a list separated by romanettes.  Neither of those cases interprets a statutory text that introduces the items as "necessary" preconditions like Code § 56-49.01(A) does.  *See supra* at 33.

34

is whether some administrative regulation creates a need — a *regulatory need* — for a pipeline company to enter private property against a landowner's will when selecting a proposed pipeline route. The answer is no.

As noted earlier, *see supra* at 27-31 and accompanying footnotes, the FERC pre-certificate application regulations do not require a pipeline company to enter private property against a landowner's will. *See* 18 C.F.R. § 157.8(a)(1); *id.* § 380.12(a)(2), (f)(2)(ii); *id.* § 385.2013. Instead, they assume that many landowners will consent and that the pipeline company can enter the property of those who do not consent after FERC issues a certificate conferring the power of eminent domain, *see id.* § 157.8(a)(1); *id.* § 380.12(a)(2), (f)(2)(ii); *id.* § 385.2013, which is the underlying constitutional justification for what would otherwise be an actionable trespass. The majority's need-sequencing argument thus relies on the unproven assumption that a pipeline company needs to have unauthorized access to private property prior to obtaining a FERC certificate that would authorize that very access.

2.

Next, the majority contends that interpreting "and" in its ordinary conjunctive sense "would render certain portions of the statute meaningless." *Ante* at 10. As the majority correctly observes, *see ante* at 10, precondition (ii) itself lists several different disjunctive reasons for entering private property. Some occur early in the process (e.g., "the selection of the most advantageous location or route"), and some long afterwards (e.g., "improv[ing] or straightening . . . a line or works," "changing the location or construction of a pipeline," or "providing additional facilities"). *Ante* at 10-11 (alteration omitted) (quoting Code § 56-49.01(A)). From that observation, the majority concludes that "these [later] activities would be

35

conducted after, and independent of, the satisfaction of any regulatory requirements required to obtain the certificate." *Ante* at 11.

The error in this thinking is that precondition (i) refers generally to "regulatory requirements," Code § 56-49.01(A), not solely to the "regulatory requirements required to obtain the certificate," *ante* at 11. The Natural Gas Act requires pipeline companies to maintain, as well as obtain, a FERC certificate to sell and transport natural gas. *See* 15 U.S.C. § 717f(c)(1). This provision also prohibits a pipeline company from engaging in the "construction or extension of any facilities" for the transportation or sale of natural gas without a certificate of public convenience and necessity "authorizing such acts or operations." *Id.* In other words, the Natural Gas Act requires further certificates (and thus surveys) for the modification or extension of existing facilities.[16] Therefore, regulatory requirements could arise even after the initial certificate.

As a fallback, the majority states that "[e]ven if there were still regulatory requirements that needed to be satisfied after the construction of the pipeline," Code § 56-49.01 "would no longer be necessary, because any activities necessary for the satisfaction of regulatory requirements after the pipeline was built would likely be limited to the property to which the

---

[16] The term "facilities" does not include "auxiliary installations" or "replacement facilities." *See* 18 C.F.R. § 2.55(a)-(b) (emphases omitted) (altering capitalization). Therefore, a pipeline company could modify an existing pipeline and its attendant structures without an additional FERC certificate provided that the modification satisfies the definition of an auxiliary installation or a replacement facility and that the company gives notice to landowners if such activity would involve "ground disturbance," *id.* § 2.55(c). When the proposed activity does not satisfy these definitions, a pipeline company may apply for a blanket certificate. *See supra* note 10. Some of the activities conducted under such a blanket certificate require or contemplate surveys or studies on land to which the pipeline company may or may not already have access. *See* 18 C.F.R. § 157.206(b)(5)(ii); *id.* § 157.208(c)(9), (e)(4); *id.* § 157.213(c)(6)-(7); *id.* § 157.214(b)(4), (c)(5); *id.* § 157.215(b)(1)(vi), (2)(iv); *id.* § 157.216(c)(5); *id.* § 157 app. I § 4(a); *id.* § 157 app. II § (3)-(6), (9).

natural gas company already has access, i.e., the property occupied by the pipeline." *Ante* at 11

note 7. I do not agree. Precondition (ii) of Code § 56-49.01(A) permits surveys necessary for

"changes of location or construction" and "providing additional facilities" for an existing

pipeline. Both justifications could easily necessitate surveys of private property outside of the

previously condemned strip or on adjacent property not subject to any prior condemnation order.

*See supra* at 36 & note 16.

3.

Continuing, the majority states that "[w]e must also consider the nature of the enumerated

provisions." *Ante* at 11. The first is "entirely objective" (whether an activity is necessary to

satisfy a regulatory requirement or not), while the second "has a significant subjective

component" (determining "the most advantageous location or route"). *Ante* at 11 (emphasis and

citation omitted). From that accurate observation, the majority concludes:

> Reading the "and" separating these provisions in the conjunctive
> effectively eliminates [a pipeline company's] discretion, as a
> natural gas company would only be permitted to conduct those
> activities that are necessary to satisfy both provisions. The factors
> that a natural gas company could weigh in selecting the most
> advantageous route or improving the existing route would be
> limited to only those factors that are also necessary to satisfy the
> regulatory requirements. Such a construction of the statute would
> effectively eliminate any differentiation in the two enumerated
> provisions.

*Ante* at 12.

This argument simply assumes its own conclusion: Because a pipeline company has the

discretion to figure out where the pipeline should go or how to improve it, it should also have the

discretion to enter private property against a landowner's will. Under this view, imposing Code

§ 56-49.01(A)'s first precondition — which limits entry onto private property to the extent

"necessary (i) to satisfy any regulatory requirements" — means that a pipeline company cannot

37

use its discretion to enter onto private property against a landowner's will when no "regulatory requirements" make it "necessary" to do so, Code § 56-49.01(A). That result, I agree, is exactly what precondition (i) does. What I do not understand is why the majority believes that simply stating that result means that it cannot be true.

The majority's only answer appears to be that "by inextricably coupling the two enumerated provisions, any discretion granted to natural gas companies would be taken away for no discernible purpose." *Ante* at 10. No discernible purpose? What about the legislative purpose to withhold from a pipeline company the legal license to trespass onto private property when no "regulatory requirements" make it "necessary" to do so, Code § 56-49.01(A)? This limitation, it seems to me, is the primary, easily discernable purpose of the first precondition.

The majority adds that the second precondition would be "eviscerated" if combined with the first. *Ante* at 11. How is that so? A pipeline company can weigh as many discretionary factors as it deems prudent in making the determination that a survey of a particular parcel is necessary to select the most advantageous route for a pipeline or to improve an existing pipeline. Imposing the additional requirement that the survey also be necessary to satisfy regulatory requirements does not preclude the use of any discretionary factors that a pipeline company can consider in making the subjective determination that precondition (ii) requires.

4.

Finally, the majority asserts that its conclusion "is further supported by . . . . the fact that, within the first sentence of this statute, the General Assembly has unequivocally used the word 'and' in both the conjunctive and the disjunctive." *Ante* at 12. Apparently this observation is an invitation to compare and contrast other uses of the word "and" in "the first sentence of this statute." *Ante* at 12. If so, I accept that invitation and point out that immediately following the

phrase at issue in this case is another phrase using "and" that lists three items with parenthetical subdivisions. This phrase states that a pipeline company

> may enter upon any property without the written permission of its owner if (a) the natural gas company has requested the owner's permission to inspect the property as provided in subsection B, (b) the owner's written permission is not received prior to the date entry is proposed, *and* (c) the natural gas company has given the owner notice of intent to enter as provided in subsection C.

Code § 56-49.01(A) (emphasis added). There can be no doubt that the "and" in this example means "and," not "or." *See Chaffins v. Atlantic Coast Pipeline, LLC*, 293 Va. 564, 569, 801 S.E.2d 189, 191 (2017).[17] Because this phrase lists the necessary conditions for a nonconsensual entry, it is highly analogous to the phrase used just a few words earlier in the same sentence and at issue here, undermining the majority's reliance on the various uses of "and" in this provision.

IV.

In sum, the intent of Code § 56-49.01(A) would not be "completely aborted," *La France Cleaners & Laundry Corp.*, 216 Va. at 281, 217 S.E.2d at 882, if we interpreted "and" to mean "and" in this statute. If anything, the opposite is true. Judicially substituting "or" in place of "and" in the phrase at issue here decouples the right of nonconsensual entry from its constitutional justification under the power of eminent domain. It subordinates the ancient common-law rights of private property owners to the commercial interests of a pipeline company that is under no legal requirement to enter onto another's land. And it effectively authorizes a foreign pipeline company that has neither applied for, nor received, a FERC certificate to

---

[17] This point also refutes the majority's view that the use of "the auxiliary verb 'may'" in the provision at issue here justifies reading "and" to mean "or," *ante* at 9. If that argument were true, the conjunctive list just quoted — which is also preceded by "may" — should also be read in the disjunctive, which is demonstrably wrong.

39

trespass onto private property within the Commonwealth based solely on the company's self-interest in determining the location of a future pipeline.

I respectfully dissent.

**APPENDIX TO DISSENTING OPINION**

*McCurdy v. Mountain Valley Pipeline, LLC*, No. 1:15-03833, 2015 U.S. Dist. LEXIS 96062, at *6-10 (S.D. W. Va. July 23, 2015) (unpublished) (noting that FERC will often issue conditional certificates that afford a pipeline company the power of eminent domain and thus the right to survey);

*PennEast Pipeline Co.*, 162 FERC P61,053, 2018 FERC LEXIS 90, at *84-86, *92-93, *108-09, *113-15, *117, *121-22, *124-33, *150-51, *213, *215-16, *220, *223-26, *229-34, *237-39, *242 (2018);

*Mountain Valley Pipeline, LLC*, 161 FERC P61,043, 61,317, 61,319-20, 61,324, 61,331-32, 61,342-47 (2017);

*Atlantic Coast Pipeline, LLC*, 161 FERC P61,042, 61,259, 61,262, 61,264-65, 61,268-69, 61,280-81, 61,284-88 (2017);

*Tennessee Gas Pipeline Co.*, 160 FERC P61,144, 61,615-16, 61,626-30 (2017);

*Transcontinental Gas Pipe Line Co.*, 155 FERC P61,016, 61,071, 61,086, 61,089-91 (2016);

*Constitution Pipeline Co., LLC*, 154 FERC P61,046, 61,269-71 (2016);

*Algonquin Gas Transmission, LLC*, 150 FERC P61,163, 62,098-99, 62,107, 62,110-11, 62,113-14 (2015), *amended on other grounds by* 157 FERC P61,011 (2016);

*Constitution Pipeline Co.*, 149 FERC P61,119, 62,214-15, 62,223, 62,225-30 (2014);

*City of Clarksville*, 149 FERC P61,022, 61,075-76, 61,078-81 (2014);

*Sierrita Gas Pipeline, LLC*, 147 FERC P61,192, 62,062, 62,065, 62,070-72 (2014);

*Bison Pipeline LLC*, 131 FERC P61,013, 61,086-87, 61,090-93, 61,095-96, *amended on other grounds by* 132 FERC P62,163 (2010), *and vacated on other grounds*, 149 FERC P61,243 (2014);

*AES Sparrows Point LNG, LLC*, 129 FERC P61,245, 61,285-87 & n.27, 61,297-98, 61,315-16, 61,319-21 (2009);

*Pacific Connector Gas Pipeline, LP*, 129 FERC P61,234, 62,131, 62,135, 62,137, 62,141-43, 62,145, 62,147-48 (2009), *vacated on other grounds*, 139 FERC P61,040 (2012);

*Florida Gas Transmission Co.*, 129 FERC P61,150, 61,653, 61,657, 61,662, 61,664-66 (2009), *reh'g granted on other grounds*, 130 FERC P61,194 (2010);

*Chestnut Ridge Storage LLC*, 128 FERC P61,210, 61,980, 61,984-85, 61,987-91 (2009), *vacated on other grounds*, 139 FERC P61,149 (2012);

*Bradwood Landing LLC*, 126 FERC P61,035, 61,181, 61,183, 61,192 (2009);

*AES Sparrows Point LNG, LLC*, 126 FERC P61,019, 61,061-62, 61,066-67, 61,069-71, 61,073-74, 61,077-84, 61,087-90, *modified*, 129 FERC P61,245 (2009), *and vacated on other grounds*, 145 FERC P61,113 (2013);

*MarkWest Pioneer, L.L.C.*, 125 FERC P61,165, 61,877, 61,880-83 (2008);

*Bradwood Landing LLC*, 124 FERC P61,257, 62,306, 62,313-15, 62,318, 62,322-24, 62,327-30 (2008), *vacated as moot sub nom. Oregon v. Federal Energy Regulatory Comm'n*, 636 F.3d 1203 (9th Cir. 2011);

*Rockies Express Pipeline LLC*, 123 FERC P61,234, 62,444, 62,447-53, 62,457-58, 62,462-66, 62,468-70 (2008), *amended on other grounds by* 126 FERC P61,225 (2009);

*Gulf Crossing Pipeline Co.*, 123 FERC P61,100, 61,744-45, 61,747, 61,749-51 (2008), *amended on other grounds by* 127 FERC P62,013 (2009), *and* 127 FERC P62,140 (2009), *and* 127 FERC P61,299 (2009);

*Southeast Supply Header, LLC*, 120 FERC P61,257, 62,082-84, 62,086-91 (2007), *amended on other grounds by* 123 FERC P61,310 (2008), *and* 124 FERC P61,120 (2008);

*Millenium Pipeline Co.*, 117 FERC P61,319, 62,579-80, 62,582, 62,585-87, 62,589, 62,593-600 (2006), *reh'g granted in part on other grounds sub nom. Empire State Pipeline*, 119 FERC P61,173 (2007), *and amended on other grounds sub nom. by Empire Pipeline, Inc.*, 121 FERC P61,129 (2007), *and* 124 FERC P62,177 (2008), *and vacated in part on other grounds sub nom. Algonquin Gas Transmission, LLC*, 129 FERC P61,049 (2009);

*Midwestern Gas Transmission Co.*, 116 FERC P61,182, 61,778-79, 61,785-86, 61,789-93 & n.81, 61,795-99 (2006);

*Midwestern Gas Transmission Co.*, 114 FERC P61,257, 61,813, 61,820-24, 61,827-31 (2006);

*Liberty Gas Storage LLC*, 113 FERC P61,247, 61,982-83, 61,988-92 (2005), *amended on other grounds by* 117 FERC P61,224 (2006), *and* 133 FERC P62,033 (2010);

*Golden Pass LNG Terminal LP*, 112 FERC P61,041, 61,310, 61,313-18 (2005), *amended on other grounds sub nom. by Golden Pass Pipeline LP*, 117 FERC P61,015 (2006), *and* 117 FERC P61,332 (2006), *and amended on other grounds sub nom. by Golden Pass Pipeline LLC*, 134 FERC P61,037 (2011);

*East Tenn. Nat. Gas Co.*, 105 FERC P61,139, 61,738-39 (2003);

*East Tenn. Nat. Gas Co.*, 102 FERC P61,225, 61,659 (2003);

*Islander E. Pipeline Co.*, 102 FERC P61,054, 61,120, 61,136-38 (2003);

*East Tenn. Nat. Gas Co.*, 101 FERC P61,188, 61,753-56, 61,764-71 (2002), *vacated in part on other grounds sub nom. East Tenn. Nat. Gas, LLC*, 127 FERC P61,259 (2009);

*Islander E. Pipeline Co.*, 100 FERC P61,276, 62,123, 62,125-26, 62,129-31 (2002);

*Independence Pipeline Co.*, 92 FERC P61,268, 61,893 (2000);

*Independence Pipeline Co.*, 89 FERC P61,283, 61,834, 61,856-57, 61,862, 61,874-78, 61,880-84 (1999), *modified*, 91 FERC P61,102 (2000), *and amended on other grounds sub nom. by Transcontinental Gas Pipe Line Corp.*, 93 FERC P61,241 (2000), *and vacated in part on other grounds*, 100 FERC P61,082 (2002);

*Southern Nat. Gas Co.*, 85 FERC P61,134, 61,512-13, 61,527, 61,534, 61,537-38 (1998);

*Alliance Pipeline L.P.*, 84 FERC P61,239, 62,216, 62,221-22, 62,224-29 (1998);

*Portland Nat. Gas Transmission Sys.*, 83 FERC P61,080, 61,392-95 (1998);

*Destin Pipeline Co.*, 81 FERC P61,211, 61,898-99, 61,901-02, 61,904-06 (1997);

*Mojave Pipeline Co.*, 72 FERC P61,167, 61,833, 61,838-40, 61,842-44 (1995), *vacated as moot*, 75 FERC P61,108 (1996), *appeal dismissed as moot*, *Public Utils. Comm'n v. Federal Energy Regulatory Comm'n*, 100 F.3d 1451 (9th Cir. 1996), *enforced*, 78 FERC 61,163 (1997);

*Southern Nat. Gas Co.*, 71 FERC P61,101, 61,338-39, 61,341-44 (1995);

*Gateway Pipeline Co.*, 55 FERC P61,488, 62,682-85, 62,690-92 (1991), *amended on other grounds by* 59 FERC P61,088 (1992);

*Iroquois Gas Transmission Sys., L.P.*, 53 FERC P61,194, 61,760-62 & n.210, 61,767, 61,788-93 (1990), *amended on other grounds by* 132 FERC P61,230 (2010);

*Columbia Gas Transmission Corp.*, 40 FERC P61,029, 61,084-85 (1987).